HARDING v. STANDARD OIL CO. et al.

(Circuit Court, N. D. Illinois, E. D. October 25, 1910.)

No. 28,865.

1. DOMICILE (§ 2*)— DEFINITION — "RESIDENCE" DISTINGUISHED —"CITIZENSHIP."

"Domicile" and "citizenship" are substantially synonymous terms in most cases, but there is a marked distinction between "domicile" and "residence"; the term "residence" indicating a place of abode, whether permanent or temporary, while "domicile" denotes a fixed permanent residence, to which, when absent, one has the intention of returning, and when there has been an actual removal with intent to make a permanent residence, and the acts of the party correspond with the purpose, the change of domicile is completed, and the law forces on him the character of a citizen of the state where he has chosen his domicile, although he may have formerly declared that he nevertheless considered himself a citizen of the state he had left.

[Ed. Note.—For other cases, see Domicile, Cent. Dig. § 2; Dec. Dig. § 2.*

For other definitions, see Words and Phrases, vol. 3, pp. 2168-2179; vol. 8, pp. 7641, 7642; vol. 7, pp. 6151-6161; vol. 8, p. 7788; vol. 2, pp. 1175, 1176.]

2. CITIZENS (§§ 2, 11*)—"CITIZENSHIP."

"Citizenship" carries with it the idea of connection or identification with the state, and a participation in its functions, and, as such, implies much more than residence. In the Constitution and laws of the United States, the term is generally, if not always, used in a political sense to designate one who has the rights and privileges of a citizen of a state or of the United States. A change of citizenship is not shown unless residence in the old state is in good faith given up and a permanent residence is acquired in a new one.

[Ed. Note.—For other cases, see Citizens, Cent. Dig. §§ 1, 13–15; Dec. Dig. §§ 2, 11.*

For other definitions, see Words and Phrases, vol. 2, pp. 1175, 1176.]

3. REMOVAL OF CAUSES (§§ 26, 86*)—PETITION—RESIDENCE—"CITIZENSHIP."

An allegation of residence in a removal petition is not an allegation of citizenship in the state where residence is alleged. "Citizenship," as used in the removal laws and the jurisdiction statute of 1875, means residence with the intention of permanently remaining in a particular place.

[Ed. Note.—For other cases, see Removal of Causes, Cent. Dig. §§ 60-63, 170–174; Dec. Dig. §§ 26, 86.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

4. WORDS AND PHRASES—"RESIDENCE."

A person cannot be a resident of two states at the same time, since residence is the act of residing or dwelling in a place for some continuance of time; the act or state of being seated or settled in a place. The term "residence" is flexible in its meaning, and may be given a restricted or enlarged meaning according to the connection in which it is used. It involves, however, the idea of permanency and fixed intention to remain, so that an allegation of residence in one state implies nonresidence in another.

5. WORDS AND PHRASES—"RESIDENCE"—"INHABITANCY"—"INHABITANT."

"Inhabitancy" and "residence" are synonymous terms; an "inhabitant" of a place being one who ordinarily is personally present there, not merely in itinere, but as a resident and dweller therein.

[Ed. Note.—For other definitions, see Words and Phrases, vol. 4, pp. 3594–3604; vol. 8, p. 7687.]

6. CITIZENS (§ 11*)—"CHANGE OF CITIZENSHIP"—ELEMENTS.

A "change of citizenship" involves an intention to make the change, actual removal accompanied by permanent residence in a new home with the intention of remaining there permanently, and the intention of returning there whenever absent.

[Ed. Note.—For other cases, see Citizens, Dec. Dig. § 11.*

For other definitions, see Words and Phrases, vol. 2, pp. 1051–1059; vol. 8, p. 7599.]

7. CITIZENS (§ 10*)—CHANGE OF CITIZENSHIP—EVIDENCE.

Evidence held insufficient to show a change of citizenship of complainant from Illinois to California.

[Ed. Note.—For other cases, see Citizens, Dec. Dig. § 10.*]

Bill by George F. Harding against the Standard Oil Company and others. On issue of citizenship. Denied.

William J. Ammen, for complainant.
Mayer, Meyer, Austrian & Platt, for defendants.

SANBORN, District Judge. The removal petition was amended pursuant to order granting leave (170 Fed. 651), and an answer filed denying that the complainant was in fact when this suit was commenced, in October, 1907, a citizen of California, and not of Illinois, as alleged in the amended petition. A large amount of testimony was taken on this special issue, much of it in open court. Defendants sustain the burden of proof.

Mr. Harding, whose citizenship is in question, is over 80 years of age. He is a lawyer of marked ability. From his father he inherited a large amount of real estate in several counties in Illinois, other than Cook, in which the city of Chicago is situated, Winnebago, Lake, Montgomery, McDonough, Iroquois, Douglas, Mercer, Peoria, Warren, and Henderson counties. Many years ago he located in Chicago, where he practiced law and acquired considerable real property, also becoming interested in the Firemen's Insurance Company and other business matters.

During the year 1889 his wife left him, and on February 3, 1890, filed her suit for separate maintenance in the circuit court for Cook

county, Ill., resulting in a decree for separate maintenance and alimony July 26, 1897. The case was most vigorously litigated, especially as to the amount and payment of alimony. In its various stages it is reported in 40 Ill. App. 202; 79 Ill. App. 590, 621; 105 Ill. App. 363; 120 Ill. App. 389; 144 Ill. 588, 32 N. E. 206, 21 L. R. A. 310; 180 Ill. 481, 54 N. E. 587; 180 Ill. 592, 54 N. E. 604, and 205 Ill. 105, 68 N. E. 754. The last proceeding in court was March 27, 1905.

At the commencement of this proceeding Mr. Harding's home was 2536 Indiana avenue, Chicago. He continued to live there until May 15, 1895, when he claims to have removed to San Diego, Cal., and which he still claims as his residence and domicile. At this date he owned a large amount of real estate in Chicago, heavily incumbered, as well as the country property, was still interested in the insurance company, and was a party to a number of important lawsuits. He says, however, that he had reason to believe that his suit with his wife was practically terminated through a stipulation then recently offered by him to his wife, leaving only the amount of alimony in dispute, and that none of the other litigation would trouble him. He was not in good health and thought a change of his home to California would be beneficial. He therefore turned over his business office to his son, George F. Harding, Jr., gave him a power of attorney to attend to all his business, terminated his membership in all the Chicago clubs to which he belonged, except the Chicago Athletic Club, parted with all his horses and vehicles, gave up his political activities in Chicago, installed his daughter Beatrice in his house, gave his son authority to sign his name to checks on his bank account, and "generally pulled up all my relations in Chicago, and they never have been restored in any way in any direction."

Before stating the facts on which complainant bases his claim to citizenship in California, the law governing questions of citizenship and residence in the federal courts should, for the sake of clearness, be cited. It is insisted for Mr. Harding that he became a citizen of California in 1895, and, once having changed his domicile, it continues until the acquisition by him of another is clearly shown; and, although he has not been in California for nearly eight years, yet there is no proof that he has reacquired his former Illinois citizenship, having no home there, and spending no time there except when compelled to do so in litigation to which he is a party, pending there. It is further contended that, as the courts of California have held him to be a resident there, his citizenship is established, and the presumption of its continuance. It is necessary, therefore, to state the law as to citizenship or domicile and residence or inhabitancy, and then to recite the facts established by the evidence.

The words "citizenship," "residence," "domicile," and "inhabitancy," as used in federal statutes, have often been defined by the United States courts, with almost entire agreement; although the decision of a particular case may vary with its circumstances and the mental constitution of the judge. Chinese Tax Cases (C. C.) 14 Fed. 338, 344. "Domicile" and "citizenship" are substantially synonymous terms, in most cases. Collins v. Ashland (D. C.) 112 Fed. 175; Penfield v.

Chesapeake, etc., Co., 134 U. S. 351, 10 Sup. Ct. 566, 33 L. Ed. 940, where a person was domiciled in New York but resided in Missouri.

"There is a marked distinction between domicile and residence. The term 'residence' simply indicates the place of abode, whether permanent or temporary: 'domicile' denotes a fixed, permanent residence, to which, when absent, one has the intention of returning." Corel v. Chicago, etc., Co. (C. C.) 123 Fed. 452, 454.

In Mitchell v. United States, 21 Wall. 352 (22 L. Ed. 584), the court say:

"'Domicile' has been thus defined: 'A residence at a particular place, accompanied with positive or presumptive proof of an intention to remain there for an unlimited time.' By the term 'domicile,' in its ordinary acceptation, is meant the place where a person lives and has his home. A place where a person lives is taken to be his domicile until facts adduced establish the contrary. * * * A domicile, once acquired, is presumed to continue until it is shown to have been changed. Where a change of domicile is alleged, the burden of proving it rests upon the person making the allegation. To constitute the new domicile two things are indispensable: First, residence in the new locality; and, second, the intention to remain there. The change cannot be made except facto et animo. Both are alike necessary. Either without the other is insufficient. Mere absence from a fixed home, however long continued, cannot work the change. There must be the animus to change the prior domicile for another. Until the new one is acquired, the old one remains. These principles are axiomatic in the law upon the subject."

"When there has been an actual removal with intent to make a permanent residence, and the acts of the party correspond with the purpose, the change of domicile is completed, and the law forces upon him the character of a citizen of the state where he has chosen his domicile, although he may have formerly declared that he nevertheless considered himself a citizen of the state he has left." Pacific, etc., Co. v. Tompkins, 101 Fed. 539, 41 C. C. A. 488.

"Citizenship" implies much more than "residence" It carries the idea of connection or identification with the state, and a participation in its functions. Daniel, J., in Dred Scott v. Sandford, 19 How. 476, 15 L. Ed. 691. It applies to a person possessing social and political rights, and sustaining social, political, and moral obligations. Daniel, J., dissenting, in Rundle v. Delaware, etc., Co., 14 How. 80, 14 L. Ed. 335. In the Constitution and laws of the United States the term is generally, if not always, used in a political sense to designate one who has the rights and privileges of a citizen of a state or of the United States. Baldwin v. Franks, 120 U. S. 678, 7 Sup. Ct. 656, 30 L. Ed. 766. A person may be a citizen of a state but not of the United States; as, an alien who has declared his intention to become a citizen, and who is by local law entitled to vote in the state of his residence, and there exercise all other local functions of local citizenship, such as holding office, right to poor relief, etc., but who is not a citizen of the United States. Taney, C. J., in Dred Scott v. Sandford, 19 How. 405, 15 L. Ed. 691; Slaughterhouse Cases, 16 Wall. 74, 21 L. Ed. 394. An allegation of residence in a state does not show citizenship therein. Continental Insurance Co. v. Rhoads, 119 U. S. 237, 7 Sup. Ct. 193, 30 L. Ed. 380; Everhart v. Huntsville College, 120 U. S. 223, 7 Sup. Ct. 555, 30 L. Ed. 623; Denny v. Pironi, 141 U. S. 121, 11 Sup. Ct. 966, 35 L. Ed. 657; Shaw v. Quincy Min. Co., 145 U. S. 444, 12 Sup. Ct. 935, 36 L. Ed. 768; Bicycle Stepladder Co. v. Gordon (C. C.)

57 Fed. 529 (Jenkins, C. J.); De La Montanya v. De La Montanya (D. C.) 158 Fed. 117. Change of citizenship is not shown unless residence in the old state is in good faith given up, and permanent residence in the new one acquired. Chicago, etc., Co. v. Ohle, 117 U. S. 123, 6 Sup. Ct. 632, 29 L. Ed. 837.

The distinction between "citizenship" and "residence" is illustrated by the cases cited by the Supreme Court in Galveston, etc., Co. v. Gonzales, 151 U. S. 496, 14 Sup. Ct. 401, 38 L. Ed. 248. Picquet v. Swan, 5 Mason, 35, Fed. Cas. No. 11,134, is one of them, in which Judge Story held that a citizen of Massachusetts, residing in France, was not an inhabitant of the United States. Judge Story said:

"A person might be an inhabitant without being a citizen; and a citizen might not be an inhabitant, though he retain his citizenship. Alienage or citizenship is one thing; and inhabitancy, by which I understand local residence, animo manendi, quite another."

Another of the cases cited approvingly is Jopp v. Wood, 34 Beavan, 88, where 25 years' absence and doing business in India did not change the domicile of a Scotchman. Another is In re Capdeville, 2 H. & C. 985, as to a Frenchman who had resided and done business in England 29 years without losing his French domicile.

"Citizenship, as used in the law under consideration (the jurisdiction statute of 1875), means residence with intention of remaining permanently at that place. A man may reside in a state for an indefinite period of time without becoming a citizen." Winn v. Gilmer (C. C.) 27 Fed. 817.

The domicile and citizenship were held to have been changed.

A person cannot be a resident of two states at the same time. Residence is the act of residing, abiding, or dwelling in a place for some continuance of time; the act or state of being seated or settled in a place.

" 'It may happen that one may have two places of residence, in one of which he resides during one portion of the year, in the other during the remaining portion. In such case the place at which he happens to be constitutes his residence so long as he is there, and ceases to be such as soon as he leaves it for the other place.' " Baker, J., in Zebert v. Hunt (C. C.) 108 Fed. 449, U. S. C. C., Dist. of Indiana.

By this rule a citizen of Illinois might have his summer residence at his summer home at Lake Geneva, Wis., and his winter residence at his winter home in Florida or Pasadena.

"The term residence is flexible, and may be given a restricted or enlarged meaning considering the connection in which it is used. It involves, however, some idea at least of permanency and fixed intention to remain." Willingham v. Swift & Co. (C. C.) 165 Fed. 223.

An allegation of residence in one state implies nonresidence in another. Zebert v. Hunt, supra; Lawrence v. Southern Pac. R. Co. (C. C.) 165 Fed. 241.

Inhabitancy and residence are synonymous. Bicycle Stepladder Co. v. Gordon (C. C.) 57 Fed. 529.

"An inhabitant of a place is one who ordinarily is personally present there; not merely in itinere, but as a resident and dweller therein." Holmes v. R. Co. (D. C.) 5 Fed. 523.

In Sharon v. Hill (C. C.) 26 Fed. 337, the distinction between "citizenship" and "residence" is discussed at some length by Judge Deady. Among other things, he said:

"'Citizenship' and 'residence,' as has often been declared by the courts, are not convertible terms. Parker v. Overman, 18 How. 141, 15 L. Ed. 318; Robertson v. Cease, 97 U. S. 648, 24 L. Ed. 1057; Grace v. American Cent. Ins. Co., 109 U. S. 283, 3 Sup. Ct. 207, 27 L. Ed. 932; Prentiss v. Barton, 1 Brock. 389, Fed. Cas. No. 11,384. Citizenship is a status or condition, and is the result of both act and intent. An adult person cannot become a citizen of a state by simply intending to, nor does any one become such citizen by mere residence. The residence and the intent must coexist and correspond; and though, under ordinary circumstances, the former may be sufficient evidence of the latter, it is not conclusive, and the contrary may always be shown; and, when the question of citizenship turns on the intention with which a person has resided in a particular state, his own testimony, under ordinary circumstances, is entitled to great weight on the point."

It was admitted by the plaintiff in the Sharon Case that he had resided in California for a long time, but he testified that he never intended to become a citizen of California or cease to be a citizen of Nevada. It was held that he was a resident of the former and citizen of the latter state. The following decisions approve the rule of the Sharon Case: McDonald v. Salem, etc., Co. (C. C.) 31 Fed. 577; Collins v. Ashland, supra; Eisele v. Oddie (C. C.) 128 Fed. 941.

The declarations or statements of a person of his intention are not conclusive. Winn v. Gilmer (C. C.) 27 Fed. 817; Rucker v. Bolles, 80 Fed. 504, 25 C. C. A. 600; Alabama, etc., Co. v. Carroll, 84 Fed. 780, 28 C. C. A. 207; Corel v. Chicago, etc., Co. (C. C.) 123 Fed. 452.

"On a change of domicile from one state to another, citizenship may depend upon the intention of the individual. But this intention may be more satisfactorily shown by acts than declarations. An exercise of the right of suffrage is conclusive on the subject." Shelton v. Tiffin, 6 How. 185, 12 L. Ed. 397.

Upon the question of domicile, usually coextensive in meaning with citizenship, the Supreme Court, in Mitchell v. United States, 21 Wall. 353 (22 L. Ed. 584), say:

"Among the circumstances usually relied upon to establish the animus manendi are declarations of the party, the exercise of political rights, the payment of personal taxes, a house of residence, and a place of business."

In many of the state courts "residence" and "citizenship" are regarded as convertible terms; but the federal courts have adopted a different rule, as clearly shown by the cases cited.

A change of citizenship, then, involves three elements, the intention to make the change, actual removal accompanied by permanent residence in the new home with the intention of removing there permanently (animus manendi), and the intention of returning there whenever absent (animus revertendi). In this case the intention to make the change is supported by repeated and long-continued declarations by Mr. Harding, although his acts raise doubt even on this element; while his actual removal, permanent residence in California, animus manendi and animus revertendi relating to California, find very little support in the proofs.

Concerning Mr. Harding's declarations of intention to change his residence from Chicago to San Diego, and his most positive testimony, there is ample proof in support of such intent. It is true that quite a number of written instruments were put in evidence, signed by him May 15, 1895, reciting his residence in Chicago. But a large number recite his residence in San Diego. There is also some testimony, as well as certain circumstances, which make it possible to suppose that he desired to obtain residence in California so that he might there obtain a divorce and defeat his wife's alimony. He strenuously denies this, and, even if it were clearly shown, would not prevent his acquiring another citizenship, if he actually did remove and make his permanent home in San Diego.

Mr. Harding had a sister, Mrs. Mary Schneider, living in San Diego. She lived in a small house which she had owned for some years. They had had very little social intercourse for a long time. He had his wife's lawsuit and several large cases on his hands, but seems to have thought he could get rid of this litigation, or that it would not seriously trouble him. This proved to be a great mistake. He was not in good health, suffering from a very painful and annoying ailment common to elderly men, not alarming in its nature, but which grew worse until he was finally relieved by an operation, performed in Paris in 1905. His real estate in Chicago was mortgaged for all it was worth, and he wished to turn it over to his son George, who had shown evidence of business ability, and who has since made good. His farm property was in the hands of competent agents so that it could be safely left to them. So, as he testifies, he proposed to change his residence to San Diego, attracted by its wonderful climate, where he could be out of doors all the year, and escape the rigors of winter in Chicago. He was also free from family entanglement, so far as a change of residence was concerned. His wife lived apart from him. His children had reached maturity, at least those who adhered to his cause in the family dispute. Two boys, George and Abner, and one daughter, Beatrice, sided with him; the others with the mother. So far as his intention to change his residence is concerned, therefore, it is supported by the evidence. We shall see, however, to what extent he was able to carry out that intent.

The evidence of the fact of removal is not as clear as that of intent, but more so than that relating to the acquisition of a new permanent home. He left Beatrice in charge of his home at 2536 Indiana avenue, Chicago. George also lived there, he not having married until December, 1896, and living at other places until 1902, when Beatrice left the home upon her own marriage. Mr. Harding disposed of his horses and carriages, and gave up all his clubs in Chicago, except the Chicago Athletic Club, of which he is still a member. He went to San Diego in the fore part of May, 1895, as an ordinary traveler would go, taking along nothing but what he might need on a journey.

His sister was much surprised to see him, but readily fell in with his idea of removing to San Diego. He repeatedly declared that he had come there to live. He says his sister proposed to give him a lease of her house, furnished; she to be the housekeeper, and live there

with her daughter and grandson. Accordingly, a lease was made in May, 1895, running a year at a rental of $25 a month. The paper was not found, but was referred to in Mr. Harding's testimony in his California divorce suit, tried in 1901. He says he paid rent for a while. Mrs. Schneider left San Diego for Denver in the fall of 1897, renting the place to others. Mr. Harding was assigned a room in the house.

Shortly after going to San Diego, the pending litigation in Chicago assumed a condition of great activity, requiring his immediate presence there. How much time he spent in San Diego for the next six years, or until he left it never to return, is in much doubt. There is evidence tending to show that he was in Chicago some part of each and every month after May in 1895, every month in 1896 except October, every month in 1897 except March, every month in 1898 except March and November, also in January, February, March, April, July, September, November, and December, 1899, and every month but December in 1900. It is insisted that he was not in San Diego more often or continuously because of the great activity of his Chicago lawsuits, making it impossible to carry out his intention to remove, and thus his actual residence in San Diego is not affected by these necessary absences. On the contrary, the facts show that he found it impossible to make a permanent home away from Chicago.

The most significant evidence in the case, however, is that he never in any way, or to any degree, became identified with San Diego as a city community. He had nothing in common with its inhabitants. He never voted there, paid taxes, was assessed for taxation, held real or personal property, took any interest in municipal or political affairs, nor did his name ever appear in a city directory or telephone book. To say he ever became a citizen there, implying civil and political relations, would require a great stretch of imagination. A temporary resident he may possibly have been, but never domiciled as a citizen, so as to afford any presumption of continuing status. Some 1,300 envelopes were in evidence, representing letters from him when absent from Chicago, running from 1900 to 1909. Of these only 38 were from California, three from May 28 to June 6, 1900, 29 from January 16 to February 18, 1901, while he was at the Coronado Hotel for the temporary purpose of attending his divorce suit and a suit brought against him for attorney's fees, and six from January 13 to 18, 1902, while he was on a pleasure trip to Los Angeles. The evidence of permanent residence in California, animo manendi et revertendi, is so slight as to be hardly worth serious consideration. Letters were written earlier, while he was visiting his sister, which have disappeared with the lapse of time; but the proof as a whole falls far short of showing citizenship in California.

As to animus revertendi, the proofs show that when he was absent from Chicago and San Diego he generally returned to Chicago, not San Diego. This is universally true since the year 1900. A few of the envelopes sent from California direct a return to Hotel Coronado, but most of them to Chicago. I believe not one of them sent from other places directs return to any place in California. For the last nine years there is not a hint or intimation in the proofs, other than

declarations, that Mr. Harding had a home in San Diego, or ever contemplated going there, even for a pleasure trip.

To show the difficulties besetting the case for complainant on the question of citizenship, the following is cited from his cross-examination: "Q. Give the court the street and number and city in California where you now live. A. My last stay in California— Mr. Mayer: I object. Answer my question. The Court: Answer the question if you can. A. I should say that my home in California would be — Mr. Mayer: Answer. The Court: Yes, answer the question. Mr. Ammen: I object to any such— The Court: Answer the question, or, if you cannot answer it, say so. A. It will have to be more specific, in order to answer it. I will have to answer fully, and I desire to answer fully, in saying that I cannot. The Court: You cannot answer that question? A. Not that way, no. I— Mr. Mayer: I object. A. Well, I have the right, the right of a witness to answer fully, when he says he cannot tell. * * * Q. Give the court the street and number of the house, and the city in California, where you lived when you were last in California. A. Always in the city of San Diego, and when I was there I either resided at some hotel, and chiefly, I think, at the Hotel Coronado, in said city. If you refer— I was also at the other hotels in California, upon journeys there, particularly at Los Angeles and Pasadena."

The California divorce suit was begun by complainant against his wife August 31, 1897, about a month after the decree of separate maintenance in Illinois. In the bill he alleged residence in California for a year, and in San Diego for three months, and desertion by his wife. An answer was filed on behalf of Mrs. Harding, denying his residence and the alleged desertion, and setting up the separate maintenance decree as a bar. Mr. Harding says the divorce suit was brought as a defensive measure. "I never dreamed of anything else, and so announced it. There was nothing done for four years, you see, except service." It was tried January 14–30, 1901, and a decree in his favor rendered January 31, 1901. He testified to his residence in California from 1895, and referred to the lease from his sister of her home in San Diego, but stated that she had left the city in 1897, and that he had lived at hotels in San Diego and other California cities. It appears that Mrs. Schneider sold the San Diego house January 12, 1899, and that her death occurred December 11th of the same year. The divorce decree was affirmed by the California Supreme Court October 17, 1903, and its decree reversed by the United States Supreme Court May 17, 1905, on the ground that the California court refused credit to the separate maintenance decree. The divorce decree was finally reversed by the California court, pursuant to the federal mandate, January 2, 1906.

The courts of California were not required to hold that Mr. Harding was a citizen under the federal rules in order to sustain their jurisdiction. Western states are liberal in their construction in such cases, in favor of their own jurisdiction, and their judgments are not always worthy of acceptance. He may possibly have gained a temporary residence in San Diego in 1896 or 1897, although the evidence

does not indicate even that, much less that he ever acquired a new citizenship.

It is not necessary to state the substance of the voluminous proof as to Mr. Harding's relations to Chicago, but the testimony touches them at every angle, family, club, property, business (lawsuits), and civic or political. It is true that he spent a large portion of his time away from Chicago, at Boston and nearby places, New York and Washington; but this was done to a considerable extent on account of the Chicago litigation business. These absences were always accompanied by the intention to return to Chicago, and not to San Diego. Most of the proof relating to Chicago tends to show residence there, though many contrary declarations appear.

On the whole, it seems to me beyond the possibility of a doubt that George F. Harding is still a citizen of Illinois. In one part of his cross-examination, when talking rapidly and under stress, he unconsciously referred to the Indiana avenue house as his home, although the title had been transferred to a corporation controlled by his sons, and by various dummy conveyances passed to others controlled by George F. Harding, Jr., and occupied by him. Through two general deeds made by complainant in 1896 and 1897, purporting to transfer all his property to the same corporation, one recorded in Cook county and the other in Warren county, the impression was created that he had parted with all his lands in Illinois. As a matter of fact, however, they were intended to be restricted to the heavily incumbered Cook county property.

An order should be entered finding complainant to have been a citizen of Illinois when the bill was filed in the state court, October 19, 1907, and denying the motion to remand.