**William H. HARRIS**

v.

**The AMERICAN LEGION and Arthur Wayne Murphy.**

**No. IP 56-C-21.**

United States District Court
S. D. Indiana,
Indianapolis Division.

April 25, 1958.

Kivett & Kivett, Indianapolis, Ind., by Joe L. Kivett, Indianapolis, Ind., for plaintiff.

Gregg, Fillion, Fillenwarth & Hughes, Indianapolis, Ind., by Ralph B. Gregg, Indianapolis, Ind., for defendant The American Legion.

Craig & Pope, Indianapolis, Ind., by Roy A. Pope and Milton E. Craig, Indianapolis, Ind., for defendant Arthur Wayne Murphy.

STECKLER, Chief Judge.

This is an action for the recovery of damages by reason of alleged libel and slander of the plaintiff by the defendants.

The amended complaint is in two paragraphs, the first of which is in two counts, both based on alleged libel. The second paragraph is in one count, predicated on alleged slander. Each count also states in substance or alleges by reference that the plaintiff is a citizen of the State of New York; that the defendant, The American Legion, is a body corporate created by an Act of Congress with its home office and residence in Indianapolis, Marion County, Indiana, and is a citizen of the State of Indiana; that the defendant, Arthur Wayne Murphy, is a resident of Indianapolis, Marion County, State of Indiana.

Separate answers were filed by the defendants closing the issues.

In its answer The American Legion, which will be referred to herein as the "Legion", denied that the plaintiff either on the date of filing of this action, or on the date of filing his amended complaint herein was a citizen of the State of New York, but that on said dates he was a citizen of the State of Indiana. It admitted that it was a body corporate, organized pursuant to an Act of Congress of the United States adopted September 16, 1919, and had been operating since said date in accordance with said original Act and the later amendments thereto.

It further admitted that the defendant, Arthur Wayne Murphy, hereinafter referred to as "Murphy," was a resident of Indianapolis, Marion County, State of Indiana, on the date of filing this action, but denied that diversity of citizenship existed.

The defendant Murphy admitted that he was a resident of Marion County, Indiana, but alleged that he was without sufficient information to make an affirmative answer to the other allegations in plaintiff's amended complaint relative to the citizenship of the parties, which was in effect a denial of the allegations of citizenship.

The cause came on for trial before the Court, without the intervention of a jury, on the separate issue of jurisdiction under Section 1332(a) (1), Title 28 U.S.C.

The evidence relative to the citizenship of the plaintiff disclosed that he entered into the employ of the defendant Legion on January 20, 1950, as a Research Specialist, at which time he and his family lived at 840 Grand Concourse, The Bronx, New York, New York.

On or about May 1, 1950, following his indoctrination in connection with his duties as an employee he moved to the City of Indianapolis, Indiana, where he resided at various locations until his employment was terminated, February 17, 1954. In 1950, he voted in Marion County, Indiana, but has not since voted either in Indianapolis or elsewhere.

After the termination of his employment with the defendant Legion, the plaintiff has been unemployed and during the remainder of the year 1954 he remained in Indianapolis excepting for a period of time spent in Washington, D. C., where he cooperated with the Justice Department in the preparation of a case before the Subversive Activities Control Board in which he testified under oath at the hearing in May, that he lived in Indianapolis, Indiana. He also went to Texas in connection with prospective employment, and was in New York and Indiana part of the time.

While he was employed by the Legion, he paid Gross Income Taxes to the State of Indiana and also received unemployment compensation from that State following the termination of his employment. Since May, 1955 he has been rooming at the home of Mr. Marcell Pittet, 1944 Sharon Avenue, Indianapolis, Indiana, a major portion of the time, where he has kept some clothing, during which he has been looking for a job and conferring with his counsel in connection with the preparation of this case.

Prior to the filing of this action his counsel wrote a letter to the defendant Legion making a claim for damages by reason of alleged libel and slander wherein it was stated that the plaintiff resided at 1944 Sharon Avenue, Indianapolis, Indiana.

In the late Summer or early Fall of 1950, the plaintiff's family, consisting of his wife, and son, moved from 840 Grand Concourse, The Bronx, New York, New York, to Newark, Ohio, and lived with the plaintiff's parents for more than a year during which the wife was recuperating from a surgical operation, after which she moved to Levittown, New York, where she lived with some friends.

In November, 1952, the plaintiff and his wife purchased a residence at 44 Surrey Lane, Levittown, Nassau County, New York, where they moved their furniture and this residence is still owned by them. The plaintiff's wife and son have resided therein continuously since that time and he has paid property taxes in the State of New York since 1953 and during the years 1954, 1955 and 1956, he and his wife filed joint income tax returns in the State of New York. Prior to the filing of this action a telephone was installed in said premises in the plaintiff's name, which has remained in his name continuously since that time and a part of his clothing and personal effects have been kept there since the premises were purchased in 1952. His wife has been a teacher in the Nassau County School System since the Fall of 1951 and the plaintiff, his wife and their son are members of the Trinity Lutheran Church in Levittown, New York. The plaintiff has received his mail at the New York residence since its purchase and has considered that his domicile since 1952 has been at 44 Surrey Lane, Levittown, Nassau County, New York.

■ Domicile is the controlling factor in determining citizenship for diversity purposes under Section 1332(a) (1) Title 28 U.S.C.

■ In the case of Shaffer v. Tepper, D.C.1955, 127 F.Supp. 892, 893, 894, the Court in defining "Citizenship" as that term is used in connection with jurisdiction stated:

" 'Citizenship', for the purpose of determining Federal jurisdiction, depends upon domicile. Sherman v. Roosevelt Co., D.C.Mass., 48 F.Supp. 434; Collins v. City of Ashland, D.C. E.D.Ky., 112 F. 175; Harding v. Standard Oil Co., C.C., 182 F. 421; Gilbert v. David, 235 U.S. 561, 35 S. Ct. 164, 59 L.Ed. 360."

While the evidence showed that the plaintiff resided in Indiana most of the time since 1950, there is a distinction between "residence" and "domicile" and in the opinion of the Court the plaintiff's domicile, at the time of the filing of this action, was at 44 Surrey Lane, Levittown, New York, and he was a citizen of New York at that time.

The defendant Legion was incorporated by an Act of Congress adopted September 16, 1919 (Chap. 59, 41 Stat. 284–285), which has been amended from time to time by further congressional action (36 U.S.C.A.) §§ 41 to 51, incl., and Secs. 43 and 45, 1957 Cum.Ann. Pocket Part of that Title. It provides that certain persons named therein:

" * * * and such persons as may be chosen who are members of the 'American Legion', an unincorporated patriotic society of the soldiers, sailors, and marines of the Great War, 1917–1918, known as the 'American Legion', and their successors, are created and declared to be a body corporate. The name of this corporation shall be 'The American Legion.' " Chap. 59, Sec. 1, 41 Stat. 284, 36 U.S.C.A. § 41.

The Act authorized persons named in Section 1:

" * * * and such other persons as may be selected from among the membership of The American Legion, an unincorporated society of the soldiers, sailors, and marines of the Great War of 1917–1918, are authorized to meet to complete the organization of said corporation by the selection of officers, the adoption of a constitution and by-laws, and to do all other things necessary to carry into effect the provisions of this chapter * * *." Chap. 59, 41 Stat. 284, 36 U.S.C.A. § 42.

Section 3 of the original Act as amended defines the purposes of the corporation as follows:

" * * * To uphold and defend the Constitution of the United States of America; to promote peace and good will among the peoples of the United States and all the nations of the earth; to preserve the memories and incidents of the two World Wars and the Korean Hostilities fought to uphold democracy; to cement the ties and comradeship born of service; and to consecrate the efforts of its members to mutual helpfulness and service to their country."[1] Sept. 16, 1919, Chap. 59, Sec. 3, 41 Stat. 285, Oct. 29, 1942, Chap. 633, Sec. 1, 56 Stat. 1012, July 26, 1955, Chap. 386, Sec. 1, 69 Stat. 379, 36 U.S.C.A. § 43.

The Legion was clothed with the following powers under the Congressional Act as amended:

"To have perpetual succession with power to sue and be sued in courts of law and equity; to receive, hold, own, use, and dispose of such real estate and personal property as shall be necessary for its corporate purposes; to adopt a corporate seal and alter the same at pleasure; to adopt a constitution, bylaws, and regulations to carry out its purposes, not inconsistent with the laws of the United States or of any State; to use, in carrying out the purposes of the corporation, such emblems and badges as it may adopt and to have the exclusive right to manufacture, and to control the right to manufacture, and to use, such emblems and badges as may be deemed necessary in the fulfillment of the purposes of the corporation; to establish and maintain offices for the conduct of its business; to establish State and Territorial organizations and local chapter or post organizations; to publish a magazine or other publications, and generally to do any and all such acts and things as may be necessary and proper in carrying into effect the purposes of the corporation."[2] Sept. 16, 1919, Chap. 59, Sec. 4, 41 Stat. 285, June 26, 1953, Chap. 153, Sec. 1, 67 Stat. 82, 36 U.S.C.A. § 44.

Section 5 of the original Act established eligibility for membership of those who served in the first World War, which by amendment now includes those who served within certain specified periods in World War II and the Korean Hostilities.[3]

1. The Act of October 29, 1942, amended this Section to include "to uphold and defend the Constitution of the United States of America;" and to include as members the personnel of World War II. Chap. 633, Sec. 1, 56 Stat. 1012.

 The amendment of 1955 included the veterans who served during the Korean Hostilities. Chap. 386, Sec. 1, 69 Stat. 379.

2. The amendment of June 26, 1953, inserted the provision relating to the exclusive right to manufacture, the use, and control of such emblems and badges deemed necessary in the fulfillment of the purposes of the corporation. Chap. 153, Sec. 1, 67 Stat. 82.

3. The Act of October 20, 1942, provided eligibility to those who served in World War II and the Act of July 26, 1955, further extended eligibility to those who served during the Korean Hostilities. 36 U.S.C.A. § 45.

Section 9½ of the original Act (Title 36 U.S.C.A. § 50) provides for the appointment of agents for the service of process in the following language:

"Agents for service of process— As a condition precedent to the exercise of any power or privilege herein granted or conferred the American Legion shall file in the office of the secretary of state of each State the name and post-office address of an authorized agent in such State upon whom legal process or demands against the American Legion may be served." Sept. 16, 1919, Chap. 59, Sec. 9½, 41 Stat. 285.

The Committee on the Judiciary of the House of Representatives on August 20, 1919, which was prior to the adoption by Congress of the original act incorporating the Legion, reported the proposed bill to incorporate said defendant to the House and the discussion which followed indicated conclusively that it was the intent of the Committee in preparing said Legislation to incorporate the Legion as an organization, national in character, embracing all of the States and Territories of the United States equally without situs and with the right to establish its headquarters and chief office anywhere in the United States. At that session, the House defeated two proposed amendments, which, if they had been adopted, would have localized the defendant to the District of Columbia by establishment of its national headquarters in that District. Vol. 58, Part 4, Cong.Rec., pages 4062–4084. The Act as finally adopted was essentially the same as the Bill proposed by the House Committee, including the power to organize in all of the States and Territories without distinction and "to establish and maintain offices for the conduct of its business" without restriction. The rights to repeal, alter, or amend the Act is reserved under Section 10 thereof (36 U.S.C.A. § 51), but the powers and purposes originally granted to the Legion, have never been repealed nor restricted by amendment.

The evidence submitted at the separate trial on the issue of jurisdiction under Section 1332(a) (1), 28 U.S.C., established the fact that the Legion under the powers granted by Congress adopted a Constitution and Bylaws in accordance with the provisions of the Federal Act. At its first convention held in 1919 following the passage of said legislation, the Legion, by convention action, established its national headquarters at Indianapolis, Indiana, where they have been maintained since and during the intervening years, area and district offices also have been established by it in various States, under its power "to establish and maintain offices for the conduct of its business." It has organized in each state and territorial possession of the United States equally and has appointed a resident agent in each state for the service of process, as a result of which it may sue and be sued in all state courts having jurisdiction. Since its inception, its national conventions, which are composed of duly selected delegates from each state and territory, establish its legislative policy and have been held in 18 different states, and the administrative powers between conventions have been exercised at meetings of its National Executive Committee held throughout the years in various states, all as authorized under its Constitution and Bylaws.

A corporation created by an Act of Congress with authority to operate in a number of States is a citizen of the United States but not a citizen of any State for jurisdictional purposes under Section 1332(a) (1), 28 U.S.C. In defining the citizenship status of such a corporation the Supreme Court of the United States in Bankers Trust Co. v. Texas & Pacific Railway Co., 241 U.S. 295, 309, 36 S.Ct. 569, 572, 60 L.Ed. 1010, 1016, stated:

"Whether this is a suit between citizens of different states turns upon whether the Texas & Pacific Company is a citizen of Texas. It is doubtful that the pleader intended to state a case of diverse citizenship, but, be this as it may, we are of

opinion that the company is not a citizen of any state. It was incorporated under acts of Congress, not under state laws; and its activities and operations were not to be confined to a single state, but to be carried on, as in fact they are, in different states. Of course it is a citizen of the United States in the sense that a corporation organized under the laws of one of the states is a citizen of that state, but it is not within the clause of the 14th Amendment which declares that native born and naturalized citizens of the United States shall be citizens of the state wherein they reside. Nor has Congress said that it shall be regarded as possessing state citizenship for jurisdictional purposes, as is done in respect of national banks by § 24, p. 16, of the Judicial Code. In short, there is no ground upon which the company can be deemed a citizen of Texas, and this being so, the suit is not one between citizens of different states."

The Court also observed that "a corporation is never merely created. Being artificial, possessing no faculties or powers save such as are conferred by law, and having in legal contemplation no existence apart from them, its incorporation consists in giving it individuality and endowing it with the faculties and powers which it is to possess."

■ Consequently, the powers granted to the Legion and its status as a corporation stem from the Act of its creation and must be determined in accordance therewith, and state citizenship for diversity purposes did not result by reason of the fact that it was created under a Federal Law. Federal Intermediate Credit Bank v. Mitchell, 277 U.S. 213, 48 S.Ct. 449, 72 L.Ed. 854.

Section 1332(a) (1), 28 U.S.C., has always been strictly construed and the courts have refused to extend its application either by analogy, implication, or judicial interpretation.

In First Carolinas Joint Stock Land Bank of Columbia, S. C., v. Page, D.C. 1932, 2 F.Supp. 529, the Court in remanding the case stated:

" * * * The petitioner insists that the charter of plaintiff is analogous to charters of national banks. Prior to 1882 there was no statute making such banks citizens of the states where located. In 1882 (22 Stat. 162) jurisdiction of national banks was made the same as other banks, and in 1887 (24 Stat. 552) they were made citizens of the state where located. In 1923, intermediate credit banks were made citizens of the state where located. 12 U.S.C.A. § 1023. But there is no such provision as to federal land banks or joint-stock land banks. The absence of such legislation in respect to the latter is significant. We cannot assume that Congress intended to make these banks citizens of states by implication, when in similar legislation it had expressly made such provision. * * *

"If, then, a joint-stock land bank is to be deemed a citizen of the state where its principal place of business is located, it must be done by judicial determination. No court has so held."

In First Carolinas Joint Stock Land Bank of Columbia v. New York Title & Mortgage Company, D.C.1932, 59 F.2d 350, 351, the defendant filed a petition to remove the action to the District Court alleging that the plaintiff was a New York corporation doing business in South Carolina and the defendant Bank, which was chartered under the Federal Farm Loan Act, 12 U.S.C.A. §§ 811–823, to operate in both North and South Carolina with its principal place of business at Columbia in the latter state, was a citizen of that state, thus establishing diversity of citizenship for jurisdictional purposes. In discussing the issue of diverse citizenship the court stated:

"Of course, if the plaintiff is not a corporation which has its residence and citizenship for jurisdictional purposes in South Carolina, there is

no diversity of citizenship, and a remand would necessarily follow.

"* * * it is conceded by all that the citizenship of a corporation organized under an act of Congress does not make the corporation a citizen of any state. The general rule undoubtedly is that the citizenship of a federal corporation created to operate in one or more states is national only. Such a corporation has no state citizenship for jurisdictional purposes unless Congress so enacts."

The Court pointed out that "Congress has declared that national banks shall be deemed to be citizens of the state where they operate" and had likewise "vested Federal Intermediate Credit Banks with state citizenship," but that the Federal Farm Loan Act, and the amendments thereto, failed "to show that Congress has anywhere vested Joint Stock Land Banks with a state citizenship."

It concluded that the land Bank had no citizenship in a jurisdictional sense in South Carolina and remanded the case.

In Dallas Joint Stock Land Bank v. American Employers Insurance Company, D.C.1940, 35 F.Supp. 927, 928, the plaintiff alleged that it was a corporation organized under the Federal Farm Loan Act, 12 U.S.C.A. § 641 et seq., with its offices and place of business in Dallas, Texas, and was a resident of that state and that the defendant was an artificial citizen of the state of Massachusetts. The defendant, however, denied diversity and claimed that the plaintiff was a citizen of the United States but not of any state as it was incorporated under a federal statute with authority to transact business in the states of Texas and Oklahoma. The plaintiff insisted, however, that it came under the provisions of the statute which makes all "commercial banking institutions" citizens of the state in which they operate and where their domicile is located. After discussing the status of Joint Stock Land Banks, the court declined to include them by judicial interpretation, under the statute creating national banking associations and held that "there is no statute fixing the citizenship of such institution in the state in which it operates." It further commented that the fact that Congress did not fix the citizenship of Joint Stock Land Banks as it did the Intermediate Credit Banks which were created under amendment to the same chapter, meant that Congress intended that Joint Stock Land Banks should have no local citizenship status. The case was dismissed because of lack of diversity.

The Supreme Court has held that Federal Reserve Banks created after the Judicial Code was enacted, are not "National Banking Associations" within the meaning of the provision of Section 24 of the Code (Now codified as Section 1348, 28 U.S.C.).

In determining this question Mr. Justice Holmes, in American Bank & Trust Company v. Federal Reserve Bank, 256 U.S. 350, 41 S.Ct. 499, 500, 65 L.Ed. 983, 25 A.L.R. 971, said, "We agree with the Court below that the reasons for localizing ordinary commercial banks do not apply to the Federal Reserve Banks created after the Judicial Code was enacted and that the phrase 'national banking associations' does not reach forward and include them. That phrase is used to describe the ordinary commercial banks whereas the others are systematically called 'Federal Reserve Banks.' We see no sufficient ground for supposing that Congress meant to open the questions that the other construction would raise."

The foregoing decisions illustrate the fact that the courts have refused to extend jurisdiction in diversity cases either by analogy, implication or judicial interpretation where Congressional action is lacking.

Elwert v. Pacific First Federal Savings & Loan Association, D.C.1956, 138 F. Supp. 395, 400, is one of the latest cases reported covering the jurisdictional question presented here. The court, in that case, discussed the status of federal corporations organized to do business in several states in the following language:

"It appears to be now well established that a federal corporation which is organized to do business in several states is not a citizen of the state in which its principal office is located or of any other state within which it engages in its business. Federal Intermediate Credit Bank v. Mitchell, 277 U.S. 213, 48 S.Ct. 449, 72 L.Ed. 854; Bankers Trust Co. v. Texas & P. R. Co., 241 U.S. 295, 36 S.Ct. 569, 60 L.Ed. 1010; First Carolinas Joint Stock Land Bank v. New York Title & Mortgage Co., D.C.S.C., 59 F.2d 350; Fisher & Van Gilder v. First Trust Joint Stock Land Bank, 210 Iowa 531, 231 N.W. 671, 69 A.L.R. 1340.

\* \* \* \* \* \*

"It is important to note that in each of these cases the Court was dealing with a federal corporation authorized to transact its business in *several* states as distinguished from a federal corporation localized to a single state."

In that case, however, the facts disclosed that the home office of the defendant Loan Association was localized in the City of Tacoma, County of Pierre, State of Washington, under the terms of its charter which had been issued by the Home Owners Bank Board pursuant to that part of the Home Owners Loan Act of 1933 which is now codified as Sec. 1464, 12 U.S.C.A. The Court held that Congress, by its adoption of Secs. 1348 and 1349, 28 U.S.C., "did not intend to abolish the \* \* \* common law to the effect that a Federal corporation localized within one single state is a citizen of that state for jurisdictional purposes." This in no way conflicts with the established rule that a federal corporation created by Congress, without situs and with authority to operate in several states is a citizen of the United States but has no citizenship in any state for jurisdictional purposes.

The Legion, pursuant to its powers as given by Congress, was authorized to organize and operate in each state and territory of the United States and "to establish and maintain offices for the conduct of its business," without situs, and the fact that its National Headquarters have been located in Indianapolis, Indiana, since 1919 by action of its first National Convention certainly does not indicate "localization" in the sense that term is used in the cases cited in the Elwert opinion.

Plaintiff's counsel in their brief and oral argument following the trial on the separate issue of jurisdiction, contended that the Legion had become a citizen of the State of Indiana for jurisdictional purposes as a result of three successive leases under which its National Headquarters occupied certain structures which had been erected pursuant to a 1920 Act of the Indiana General Assembly supplemented by further legislation adopted in 1945.

The evidence submitted in this connection disclosed that in July, 1936, the Legion entered into a contract with the Trustees of the Indiana World War Memorial under which it leased Building "B" at the Northwest corner of the Indiana World War Memorial from year to year for occupancy by its National Headquarters and its intermediate, subsidiary, auxiliary and affiliated organizations with right of termination by either party upon notice in writing given at least three months prior to the expiration of any year. This lease was terminated on September 1, 1950, by the terms of a second lease between said parties covering a period of four years under which National Headquarters of the Legion occupied Building "C", Indiana World War Memorial Structure, upon the termination of which a third lease was executed September 12, 1954, by said parties, for an additional period of four years from September 1, 1954, on essentially the same terms and conditions contained in the previous four year lease. Each of these leases was executed pursuant to Sec. 12, ch. 50, 1920 Acts (Special Session) of the Indiana General Assembly (Section 59–201 et seq., Vol. 11, Part 1,

1951 Replacement, Burns' Indiana Statutes Annotated.) [4]

The purposes of this legislation were public in character, and Section 12, inter alia, authorized the Trustees of said Memorial to rent structures "to any organizations of soldiers, sailors and marines, and others, * * * for their meeting and headquarters."[5]

At its 1945 session the Indiana General Assembly adopted Chapter 204 [6] providing for additional structures, which was supplemental to the 1920 legislation (Sections 59–221 to 59–226, Volume 11, Part 1, 1951 Replacement, Burns' Indiana Statutes, Annotated). Section 4 provided that the appropriation of funds under Section 2 was "contingent upon action by The American Legion providing for continuance of the establishment of its national headquarters at the site of the Indiana War Memorial in the city of Indianapolis, Indiana." This supplemental legislation contained a separability clause reading as follows: "Should any section, subsection, paragraph or sentence of this act be held unconstitutional or invalid, such decision or decisions shall not affect the validity of the remaining portions of this act." This Court is of the opinion that this contingency was not only void under Section 19, Article IV of the Constitution of the State of Indiana, as it was not included in the title of the Supplemental Act, but also under Section 23 of the same Article, as such a provision, if applicable, would result in local rather than general legislation. It is significant that the 1950 and 1954 leases, each of which was executed pursuant to Section 12 of the 1920 Act, gave the Legion the right

4. The title of Acts 1920 (Spec.Sess.), ch. 50, reads: "An act providing for an Indiana World War Memorial to be located at Indianapolis, creating a board of trustees, defining its powers and duties, providing the dedication of certain real estate and interests therein described for memorial purposes, providing for limiting the use and for the control and regulation of real estate contiguous thereto, the levying of state taxes and the appropriation of money for use by said board of trustees in the erection and maintenance thereon of suitable structures to commemorate the valor and sacrifice of soldiers, sailors and marines of the United States, of all patriotic organizations, and all others who rendered loyal service and made sacrifices at home and overseas in the great World War, and to provide a place or places of meetings and headquarters for organizations of such soldiers, sailors and marines, of all patriotic organizations, and others, and for public meetings and other public purposes, and exempting the same from taxation, and declaring an emergency."

5. Sec. 12, Ch. 50, of the 1920 Acts (Spec. Sess., Indiana General Assembly), reads as follows: "Such board of trustees shall have the power to grant the use for public purposes of any structures, or any part thereof, erected by them under the provision of this act without rent or charge, or for only a nominal rental, to any organizations of soldiers, sailors and marines and others, as a place' or places for their meetings and headquarters, and for the keeping of records, archives, documents, flags, mementoes and relics, and for other public meetings and other public purposes not inconsistent with the purposes of this act, for such time and upon such terms and conditions as said board of trustees may determine."

6. The title of Acts 1945, ch. 204, reads: "An Act concerning the Indiana World War Memorial, providing for the completion of the Indiana World War Memorial according to plans adopted by the trustees of the Indiana World War Memorial, the appropriation of money for the completion of such plans, the levying of state taxes and the appropriation of money for use by the board of trustees in the erection and maintenance thereon of additional suitable structure or structures to commemorate the valor and sacrifice of soldiers, sailors and marines of the United States, of all patriotic organizations, and all others who have rendered and are rendering loyal service and have made and are making sacrifices at home and overseas in World War I or World War II, and to provide additional place or places of meetings and headquarters of all patriotic organizations of such soldiers, sailors, and marines, of all patriotic organizations, and others, and for public meetings and other purposes and exempting the same from taxation, and declaring an emergency."

to renew for an additional four years, thus making it optional as to whether it would continue to lease said premises. Furthermore, this contingency did not make the supplemental act contractual in character as the title only covers public purposes. Wisconsin & M. R. R. Co. v. Powers, 1903, 191 U.S. 379, 24 S.Ct. 107, 48 L.Ed. 229.

In 1957 the Indiana General Assembly adopted Chapter 218 under which it abolished the control of the Soldiers and Sailors Monument, the Battle Flags Commission, and the Board of Trustees for the Indiana World War Memorial, and transferred their powers, duties, and appropriations to the Indiana War Memorials Commission, created under that Chapter. (Sec. 59–1501 et seq., 1957 Cum.Pocket Sup., Vol. 11, Pt. 1, Burns' Indiana Stat. 1951 Replacement). Section 28 of this Act readopted Section 12 of the 1920 Act covering the use of the structures, thus continuing the intent as set forth in the original Act creating the World War Memorial. No where in any of this legislation is it indicated that the Legion, in leasing the structures for its National Headquarters, was to become a citizen of the State of Indiana for Federal jurisdictional purposes. The authority to establish National Headquarters was given and exercised under the Congressional Act of 1919, pursuant to which the Legion was incorporated, which gave it the right, without restriction, to establish its offices; nor did "localization" result from its occupancy of said structures as that term is only applicable in those instances where the activities of a federal corporation are confined to a single state by its charter. The powers of the Legion under the Federal Act have always been exercised equally in all of the states and territories of the United States since its inception, and its National Headquarters have also been established in Indianapolis, Indiana, pursuant to action at its first National Convention in 1919.

 The jurisdiction of Federal Courts is not controlled by state statutes or decisions, but is established by congressional authority. Nyberg v. Mont-

gomery Ward and Company, D.C., 123 F.Supp. 599, 601, 602, 603, and cases cited therein. It must therefore be concluded that the Legion is a citizen of the United States, but is not a citizen of any state for jurisdictional purposes under Sec. 1332(a) (1), 28 U.S.C.

 Under the pleadings in this case and the evidence adduced at the hearing, jurisdiction was based on the ground of diverse citizenship. However, it is the duty of the court to determine whether there is any other basis for jurisdiction. Prior to the adoption of Section 12, Chapter 229 of the Federal Act of February 13, 1925, which is codified as Section 1349, 28 U.S.C., district courts had jurisdiction of civil actions by or against any corporation upon the sole ground that it was incorporated by or under an Act of Congress, but since that time jurisdiction has been restricted to those corporations in which the United States is the owner of more than one-half the capital stock, unless, of course, there are other Federal grounds upon which jurisdiction may be predicated. No Federal question is involved merely by reason of incorporation pursuant to a Federal Act. Bankers Trust Company v. Texas & Pacific Railway, supra [241 U.S. 295, 36 S.Ct. 570], Anthony Wayne Post No. 418 v. American Legion, D.C., 5 F.Supp. 395; nor is the power "to sue and be sued * * * in courts of law and equity," which is given to the Legion, absolute as it was not intended to confer jurisdiction upon any court, but, as stated by the Supreme Court in Bankers Trust Company, only has reference to Federal, state or territorial courts "whose jurisdiction as otherwise competently defined is adequate to the occasion." Likewise, Section 9½ of the Federal Act of Incorporation, which requires the Legion "as a condition precedent to the exercise of any power or privilege * * * granted or conferred" upon it under the Act to file "in the office of the secretary of state of each State the name and post-office address of an authorized agent in such State upon whom legal process or demands against the American Legion may be served," involves venue

only and not jurisdiction over the subject matter. The pleadings and record in this case present no jurisdictional question other than the issue of diverse citizenship.

■■■■ As previously observed in this opinion, the diversity statute must be strictly construed, and jurisdiction cannot be assumed by a District Court nor conferred by agreement of the parties, but it is incumbent upon plaintiff to allege in clear terms, the necessary facts showing jurisdiction which must be proved by convincing evidence. As stated in City of Indianapolis v. Chase National Bank, 314 U.S. 63, 76, 62 S.Ct. 15, 20, 86 L.Ed. 47, 48, 54, "The dominant note in the successive enactments of Congress relating to diversity jurisdiction is one of jealous restriction. * * * In defining the boundaries of diversity jurisdiction, this Court must be mindful of this guiding Congressional policy." Again in Healy v. Ratta, 292 U.S. 263, 270, 54 S.Ct. 700, 78 L.Ed. 1248, 1253, the Court stated that the policy of the statute conferring diversity jurisdiction upon the district courts calls for its strict construction.

In his original complaint filed in this action, the plaintiff alleged that each of the defendants was a "resident" instead of a "citizen" of the State of Indiana. This defect was called to the attention of his counsel at a pre-trial conference held on November 27, 1957, following which the Court in its pre-trial Memorandum Order made note of that fact. The record revealed that prior to this conference one of the original defendants had been dismissed from the case. The Court gave leave to the plaintiff to file an amended complaint within ten days, with leave to the defendants to file their respective answers within seven days thereafter. In his amended complaint the plaintiff again alleged that the defendant Murphy was a "resident" of Indianapolis, Marion County, State of Indiana, but failed to state that he was a "citizen" thereof.

In its Pre-trial Memorandum Entry, following a later pre-trial conference held

on February 10, 1958, the Court again stated:

"The matter of diversity jurisdiction was discussed and the court was informed that the defendant is still relying upon the defense that this court is without jurisdiction by reason of failure of diversity of citizenship between the parties. It was concluded that a separate hearing should be held for the submission of this issue to the court for decision. Since this issue should be disposed of prior to the commencement of the jury trial, the date of March 5, 1958, at 9:30 o'clock a. m., is hereby fixed as the date for the hearing, and at that time the court will hear evidence and consider any trial briefs the parties will have filed in connection with such issue."

No evidence was submitted by the plaintiff at the trial on the issue of diversity as to the citizenship of the defendant Murphy.

■■■■ The Court recognizes that under Section 1653, 28 U.S.C., "defective allegations of jurisdiction may be amended upon terms in the trial and appellate courts," yet where a party is afforded the opportunity by the Trial Court, as in this case, not only of amending his complaint to correct such infirmity, but also the right at a hearing scheduled for that purpose to submit evidence establishing jurisdiction and fails to do so, the Court must dismiss, and under such circumstances the right to amend on appeal will be denied.

■■■■ In Joy v. Hague, 1 Cir., 1949, 175 F.2d 395, 396, certiorari denied 338 U.S. 870, 70 S.Ct. 147, 94 L.Ed. 534, a similar situation was considered by the Court of Appeals which disposed of the question as follows:

"The function of the trial court in matters involving jurisdiction is rather carefully defined in McNutt, Governor of Indiana, et al. v. General Motors Acceptance Corp., 298 U.S. 178, at page 182, 56 S.Ct. 780, 785, 80 L.Ed. 1135, where the court, after

declaring that it is the duty of the trial court, if it finds that jurisdiction does not exist, to proceed no further but to dismiss the suit, said: '* * * the party who seeks the exercise of jurisdiction in his favor * * * must allege in his pleading the facts essential to show jurisdiction. If he fails to make the necessary allegations he has no standing. If he does make them, an inquiry into the existence of jurisdiction is obviously for the purpose of determining whether the facts support his allegations. In the nature of things, the authorized inquiry is primarily directed to the one who claims that the power of the court should be exerted in his behalf. As he is seeking relief subject to this supervision, it follows that he must carry throughout the litigation the burden of showing that he is properly in court. * * * If his allegations of jurisdictional facts are challenged by his adversary in any appropriate manner, he must support them by competent proof.'

"Though appellants complain that the lower court erred in its conclusion that it had no jurisdiction, on the face of the record, the decision was correct,—indeed, unavoidable and mandatory upon the part of the court. Insular Police Commission v. Lopez, 1 Cir., 160 F.2d 673. Appellants now seek to have us declare this correct judgment erroneous, not because of anything the trial court did, but because of something which they now seek to inject into the record and which was never before that court. There is no error in the record; if error is to appear it will have arisen after the cause has left the trial tribunal because we allow appellants to make a record of facts which they refused to make in the trial court. In other words, appellants, having refused to amend as the District Court invited them to do, thereby knowingly acquiescing in the proposed action of the court and tacitly consenting that it might en-

ter the only order proper on the face of the record, come to this court asking leave to do what they failed to do below and attempt to create an error upon the part of the trial court because of matter never before that court."

 This Court agrees with the reasoning advanced and the conclusions reached in the foregoing case. A plaintiff should not be denied the right to amend under Section 1653, 28 U.S.C., when jurisdiction is questioned either by the court or by a party to the action, yet when the court calls the plaintiff's attention to a defective allegation as to citizenship and affords the opportunity to amend, which is not done, and further invites the plaintiff to submit evidence showing jurisdiction at a separate hearing for that purpose, but no proof is submitted, the plaintiff's right to amend and submit proof has been exhausted under said section.

The case of Joy v. Hague, supra, in no way conflicts with Brooks v. Yawkey, 1 Cir., 200 F.2d 663, nor Chicago Stadium Corporation v. State of Indiana, 7 Cir., 220 F.2d 797, as the precise question presented herein was not an issue in either of those cases.

The Court is of the opinion that it is without jurisdiction under Section 1332 (a) (1), 28 U.S.C. and this action must be dismissed as to the Legion by reason of the fact that while it is a citizen of the United States, it is not a citizen of any state for jurisdictional purposes, and that it must also dismiss as to the defendant Murphy due not only to the failure of the plaintiff to allege facts in his amended complaint showing diversity as to said defendant, but also his failure to submit evidence establishing such diversity at the separate trial on that issue, although given ample opportunity to do so.

It is so ordered with costs against the plaintiff.

The defendants are directed to file their bill for costs with the Clerk of this Court within ten days from the date of this Opinion.