**PARKER DRILLING COMPANY,**
Plaintiff,

v.

**METLAKATLA INDIAN COMMUNITY,**
Defendant and Third-Party Plaintiff,

v.

**UNITED STATES of America,**
Third-Party Defendant.

No. J75–6 Civil.

United States District Court,
D. Alaska.

April 17, 1978.

---

J. B. Bradley, of Robertson, Monagle, Eastaugh & Bradley, Juneau, Alaska, for plaintiff Parker Drilling Co.

Randall J. Weddle, of Faulkner, Banfield, Doogan & Holmes, Juneau, Alaska, Steven S. Anderson of Xiontz, Pirtle, Morisset, Ernstoff & Chestnut, Seattle, Wash., for defendant and third-party plaintiff.

Alexander O. Bryner, U. S. Atty. for Alaska, Anchorage, Alaska, for third-party defendant United States of America.

## MEMORANDUM AND ORDER

VON DER HEYDT, Chief Judge.

■ This cause comes before the court on cross motions for summary judgment.[1] For the purpose of these motions certain facts apparently are undisputed. Plaintiff's airplane was to land at the Annette Island Airport to receive fuel from Annette Aviation. Upon attempting to land the aircraft hit a snow berm and was damaged. Plaintiff is an Oklahoma corporation and federal jurisdiction is predicated upon diversity of citizenship.

Plaintiff has asserted that the Annette Island Airport is owned by the Metlakatla Indian Community in its capacity as an Indian corporation organized pursuant to § 17 of the Indian Reorganization Act, 25 U.S.C. § 477.[2] Plaintiff further alleges that Annette Aviation is owned and operated by the § 17 Indian corporation.

Defendant contends that the Annette Island Airport is upon land held by the governing body of the Metlakatla Indian Community organized pursuant to § 16 of the Indian Reorganization Act, 25 U.S.C. § 476. Defendant further contends that Annette Aviation is owned and operated by the same § 16 government organization. The issue of whether the airport and Annette Aviation are owned by the § 16 governmen-

---

1. The court notes that defendant's motion, which seeks to challenge the jurisdiction of the court, should have been denominated a motion to dismiss. *See generally* 10 Wright & Miller, *Federal Practice & Procedure*, § 2713, pp. 404–405.

2. This Act was made applicable to Alaska Indians by 25 U.S.C. § 473a.

tal organization or § 17 Indian corporation is central to the present motions. Prior to considering the merits of the opposing claims, however, a brief overview of § 16 and § 17 of the Indian Reorganization Act is necessary. Much of the following discussion is adopted from Justice Rabinowitz's scholarly opinion in *Atkinson v. Haldane*, 569 P.2d 151 (Alaska 1977).[3]

Congress, in enacting the Indian Reorganization Act provided for the creation of two separate tribal entities. The entity created by § 16 of the Act, the governmental organization, was allowed the protection of sovereign immunity traditionally afforded Indian tribes. *Atkinson, supra*, at 174–75.

Recognizing that the protection of sovereign immunity would put the Indian tribe at a competitive disadvantage in obtaining credit and entering into business transactions Congress provided for the separate and distinct Indian corporation in § 17. This corporation has the ability to waive the protection of sovereign immunity. *Atkinson, supra.*

The Metlakatla Indian Community has formally adopted both a § 16 entity and a § 17 entity. The § 16 entity, The Metlakatla Indian Community Annette Islands Reserve, Alaska, was formed by a constitution and by-laws approved by the Assistant Secretary of the Interior on August 23, 1944, and adopted by the Metlakatlans on December 19, 1944. The § 17 entity, The Metlakatla Indian Community, was formed by a corporate charter approved and ratified respectively on the same dates. *See generally Atkinson, supra*, at 170–71.

It is thus apparent that if the Annette Island Airport and Annette Aviation were owned or operated by the § 16 governmental organization that this diversity action would be precluded by sovereign immunity. *Atkinson v. Haldane, supra; Littell v. Nakai*, 344 F.2d 486, 489 (9th Cir. 1965);

*Hot Oil Service, Inc. v. Hall*, 366 F.2d 295, 297 (9th Cir. 1966). Plaintiff does not contest this conclusion.

If, on the other hand, Annette Island Airport and Annette Aviation are owned or operated by the § 17 corporate entity it is possible that sovereign immunity has been waived. Anticipating the possibility that the court might find that the activities involved the § 17 corporation defendant has made several alternative arguments.

*Burden of Proof*

Prior to addressing the substance of these motions one preliminary matter must be resolved. Plaintiff contends that in opposing defendant's motion it is to be given the benefit of all inferences and the evidence is to be viewed most favorably to it. Defendant asserts that the burden of proof on the jurisdictional issue rests with plaintiff and that all inferences should be drawn against plaintiff, citing, *inter alia*, 1 *Moore's Federal Practice*, ¶ 0.60[4].

Plaintiff concedes that it has the burden of proof at trial concerning the facts necessary to support diversity jurisdiction but maintains that in opposing a motion for summary judgment that it is to receive the benefit of all possible inferences. Plaintiff's position is basically correct.

A similar question recently was discussed by the Ninth Circuit in *Data Disc, Inc. v. Systems Tech. Assoc., Inc.*, 557 F.2d 1280, 1285 (9th Cir. 1977); *See also Sheridan v. Garrison*, 415 F.2d 699, 709 (5th Cir. 1969). In *Data Disc* the court acknowledged that the party seeking to establish *in personam* jurisdiction has the burden of establishing the jurisdictional facts. In opposing a motion to dismiss based upon a lack of jurisdiction, however, when the motion is submitted on affidavits plus other discovery materials,[4] a plaintiff need only make a prima facie showing of jurisdictional facts.

---

3. While this court is compelled by *Erie* and its progeny to accept the rule announced by the Alaska Supreme Court, the opinion in *Atkinson* thoroughly explores this issue and would be considered persuasive in any context.

4. The court should note that by a stipulation submitted on January 24, 1978, it was agreed that substantially all of the materials submitted by both parties were authentic.

It is only necessary for these materials to support a finding of personal jurisdiction. *Data Disc, supra.* A similar procedure seems appropriate for subject matter jurisdiction.

Of course, in considering plaintiff's motion, which requests a ruling that the Annette Island Airport and Annette Aviation were owned or operated by the § 17 Indian corporation, all inferences and conflicts in evidence will be resolved in defendant's favor.

*Corporate or Governmental Activity—Annette Island Airport*

Plaintiff's claims based upon ownership of the airport facility and its claims based upon ownership and operation of Annette Aviation are founded upon differing theories. In addition, its proof on the identity of the body involved in these two enterprises is slightly different. Hence, the court will consider them separately.

Defendant's primary line of attack is common to both the airport and Annette Aviation. It has steadfastly maintained that although formally approved, the corporate charter of the Metlakatla Indian Community has never been the vehicle through which the Metlakatlans have acted. Its contention is that the corporation is an empty shell which has never been "fleshed out." In support of this position it has presented various affidavits [5] and refers to many exhibits. In opposition to this argument plaintiff has produced literally reams of resolutions, contracts, agreements, etc., which refer to the Metlakatlan body executing the document as a corporation organ-

ized pursuant to the Indian Reorganization Act or some variation with the same tenor.

While it would do little to aid the analysis of the issue to list individually the documents produced, one series of documents is particularly interesting. Pursuant to 25 U.S.C. § 470, the Secretary of the Interior is authorized to make certain loans to "Indian chartered corporations." [6] In a series of transactions commencing on November 24, 1947, the Metlakatlans received various loans from that revolving fund. In all of those requests, as it was statutorily required to do, the Metlakatlans represented themselves to be acting in a corporate capacity. These loans were applied for apparently under the authority of Section 4 of the corporate charter which provides the corporation with the power "To borrow money from the Revolving Indian credit fund . . . ." [7]

In the face of overwhelming evidence that it acted at least on some occasions in its corporate capacity and in support of its corporate bare shell theory defendant has pointed to many instances in which the documents reciting corporate activity were internally inconsistent. Defendant contends that it never fully understood the § 16/§ 17 distinction and that it intended to act as a § 16 governmental unit.

A review of the documents and other authorities indicates that such a confusion clearly was possible. Many of the documents submitted were internally inconsistent. When coupled with the fact that the Alaska Supreme Court in *Atkinson v. Haldane, supra,* in 1977 delivered the first judi-

---

**5.** Certain of these affidavits presently are the subject of a motion for sanctions pursuant to Rule 56(g), Fed.R.Civ.Pro. That motion is not considered herein. The court notes that it could deny this motion solely on the lack of credibility of defendant's affiants. See generally 10 Wright & Miller, *Federal Practice & Procedure,* § 2726. The affiants have been substantially impeached by plaintiff's presentation.

**6.** 25 U.S.C. § 470 provides:
There is authorized to be appropriated, out of any funds in the Treasury not otherwise appropriated, the sum of $20,000,000 to be established as a revolving fund from which

the Secretary of the Interior, under such rules and regulations as he may prescribe, may make loans to Indian chartered corporations for the purpose of promoting the economic development of such tribes and of their members, and may defray the expenses of administering such loans. Repayment of amounts loaned under this authorization shall be credited to the revolving fund and shall be available for the purposes for which the fund is established.

**7.** Other portions of this sentence were modified by an amendment in 1950. This phrase, however, remained unchanged.

cial opinion thoroughly to explore the separate identity of the two units such confusion is not surprising. Indeed, the Supreme Court in *Metlakatla Indian Community v. Egan*, 369 U.S. 45, 49 n. 7, 82 S.Ct. 552, 556, 7 L.Ed.2d 562 (1962), noted that Metlakatla was a "chartered federal corporation under a *constitution* . . . ." (Emphasis added) It then cited both § 16 and § 17. The constitution referred to presumably is the constitution of the § 16 governmental entity and has nothing to do with the § 17 Indian corporation.[8]

It is clear, however, that plaintiff has presented sufficient evidence to establish at this juncture that Metlakatla has acted in some instances in its corporate capacity. The series of transactions concerning the revolving fund alone have amply established that point by prima facie evidence.

With respect to the Annette Island Airport itself plaintiff points to several documents to indicate that the § 17 corporate entity controls the land. Prior to considering those documents a brief history of the Airport is necessary. In 1948 the airport was leased to the United States from the Metlakatla Indian Community (hereinafter lease agreement). Several amendments to the lease agreement were executed in the ensuing years and in 1974 the lease was terminated.

Plaintiff asserts that these documents demonstrate that the Airport was leased by the § 17 corporation and upon termination that the Airport reverted to that body. Defendant asserts that the opposite conclusion is proven.

██ Plaintiff's initial contention is that the § 16 unit lacks the capacity to enter into such a lease and, therefore, the lease must have been corporate. This contention is not well taken. The Constitution and Bylaws of the governmental unit grant the Council the power,

> . . . [T]o prevent the sale, disposition, lease or encumbrance of community lands, interests in lands or other community assets *without the consent of the Community* . . . .

Article IV, Section 2. (Emphasis added) While plaintiff points to the prohibitory language of this section it is clear from the last quoted phrase that certain leases were impliedly recognized. The purpose of those leases is specifically set out in Article VII, Section 4, which states,

> The Council shall have the right, subject to approval of the Secretary of the Interior, to enter into leases for the development of the resources of the Reserve.[9]

Defendant maintains that the Annette Island Airport is a "resource" of the reserve and, hence, the lease is authorized.

Plaintiff points to Article VII, Section 3, which immediately precedes the last quoted section to narrow the construction of the term "resources." That section states, *inter alia,*

> The mineral and other natural resources of Annette Islands and the waters to the distance of 3,000 feet surrounding these islands shall be community assets.

Plaintiff would equate "resources" in section 4 with "natural resources" in section 3. Under its interpretation of the Constitution Annette Island Airport is not a natural resource and section 4 would not provide leasing authority.

Such a reading, however, is unduly restrictive. Nothing in section 4 indicates that "resource" should be construed to

---

8. This same confusion was manifested in plaintiff's complaint which stated that the corporation was organized pursuant to section 16.

Even the noted scholar on Indian Law, Felix Cohen, misinterpreted the effect of the two sections. *See* Cohen, *Handbook of Federal Indian Law*, 279 (1942; Second printing), cited at 569 P.2d 173 n. 74.

9. The court assumes that the necessity for Community consent implied from Article IV, section 2, is fulfilled by the Council's actions in accordance with Article VII, section 4. The language of Article IV, section 2, apparently was taken from 25 U.S.C. § 476. Neither party has advanced the argument that community or tribal approval in addition to Council action is required by the statute or this section of the Constitution.

mean "natural resource." In addition the implication from Article IV, Section 2, is that broader leases were contemplated. This construction of the Constitution comports with the Metlakatlans' prior construction, is quite reasonable, and should not be interfered with by the Court. *Cf. Vestal v. Hoffa,* 451 F.2d 706, 709 (6th Cir. 1971).[10]

As the court has concluded that the § 16 entity as well as the § 17 corporation[11] had the power to lease the Airport the court must explore the evidence indicating which entity did in fact lease the airport and receive it back upon termination of the lease.[12]

The original lease in 1948 has no indication that the lessor was the corporation. Quite the contrary, all indications from the lease are that it was the governmental unit. However, some of the supplemental agreements and the termination agreement indicate directly and impliedly that the original lessor was corporate.[13]

Defendant makes several arguments in support of its position that the lessor was the § 16 entity. Its basic contention is that as the original lease did not refer to the corporation as lessor that there is no question concerning the lessor's capacity. As a corollary to this proposition defendant contends that the supplemental agreements and termination agreement cannot alter the status of the original lessor. These arguments are not well taken in the context of this case.

As to the capacity of the original lessor the court notes that the identities of the persons acting for the leasing entity is of little probative value as the manager of the corporation is the Community Council set up under the Constitution to govern the § 16 unit. Corporate charter, section 3. The fact that the original lessor is not referred to in a corporate capacity is likewise of little value. As should be clear from the earlier discussion defendant has consistently maintained that the Metlakatlans were confused about the distinction between the § 16 and § 17 entity. Yet defendant now seeks to rely on the fact that as on the face of the lease only the § 16 entity entered into the lease it is proven that no corporate activity was intended. As put by plaintiff, defendant "cannot have it both ways." If there was confusion in 1948 the lease is not absolutely determinative.[14]

As to the later agreements the court does not perceive the plaintiff's argument to be that these documents in any way altered the original lessor. Rather, they are evidence by way of admission that the original lessor was corporate. When coupled with the earlier confusion they certainly are helpful in interpreting the original lease. *Cf. National Bank of Alaska v. J. B. L. & K. of Alaska, Inc.,* 546 P.2d 579, 584–585 (Alaska 1976). With this evidence and the evidence of contemporaneous con-

---

**10.** The court notes that the authority for this lease could not come from 25 U.S.C. § 415 as that statute was enacted in 1955 and this lease was entered into in 1948.

**11.** This issue is not disputed and is clear from the Corporate Charter.

**12.** The court notes at this point that it is probably theoretically possible that the § 17 corporation leased the property but was not the holder of a leasable interest. In such a case the termination of the lease would probably not cause any interest to revert to that entity. Such a lease, of course, would be subject to challenge but that issue is not present in this case. As defendant has continuously maintained that the § 16 entity entered into the lease this argument was not advanced.

**13.** It would do little to aid the analysis to set forth all of this evidence. By way of indication, however, the direct references are recitations of corporate capacity in the supplemental agreements. The implied references are that certain supplemental agreements referred to the lessor as a participant in projects that may have been corporate projects. These latter mentioned projects suffer from the same ambiguity as to participants as the present case.

**14.** The court notes that this issue of corporate/noncorporate confusion arises in a posture uncommon in corporate law. Generally, the plaintiff would be attempting to show confusion and intermingling to enable it to "pierce the corporate veil" and defendant would be maintaining the position that all activities were corporate. Here, of course, the situation is precisely the opposite.

fusion a grant of summary judgment to either party on the question of the identity of the original lessor would be improper. *Cf. Kincaid v. Kingham,* 559 P.2d 1044, 1047 (Alaska 1977).[15]

As a final argument on this point defendant asserts that as plaintiff has not shown an effective transfer of this land to the corporate entity that it must be assumed that it is still in the hands of the § 16 governing body. For this proposition it refers to a Solicitor's opinion which states in part,

> The question whether the timber involved in a particular transaction is held by a tribe, as organized under Section 16 . . or by a tribal business corporation, as organized under Section 17 . . . *is determined by the facts of each case.* . . . If this land, or the timber thereon, has not been effectively transferred or conveyed to the tribal corporation, it is not a corporate asset, and remains the property of the constitutional organization of the tribe . . . . Ordinarily it is safe to assume that a transaction of a so-called 'organized tribe' is a transaction of the tribal municipal corporation . . . . Unless documentary evidence such as a conveyance to the business corporation or contractual agreement, by resolution or otherwise, gives the business corporation an agency or proprietary relationship to certain property, it can be assumed that the corporation is not directly involved.

Opinions of the Solicitor. Department of the Interior. No. M–36545 (Dec. 16, 1958),

at p. 2 (Emphasis added). This opinion was quoted in part with apparent approval by the Alaska Supreme Court in *Atkinson, supra* at 171–172, and it appears appropriate to adopt it as the Alaskan view on the issue.

■ Based on the facts of this case, 'it cannot be said that the normal presumption as directed by the Solicitor establishes title as a matter of law. The loss of many corporate and governmental documents, coupled with the apparent confusion of defendant, and some documentary evidence linking the airport to the corporation has at least raised considerable doubt as to its ownership. The facts as presented clearly were not envisioned by the Solicitor as the ordinary case. Plaintiff is required to do no more at this stage of the litigation.

## Corporate or Governmental Activity—Annette Aviation

As with the activity surrounding the airport there is much confusion regarding the ownership and operation of Annette Aviation. The discussion of general confusion applies with equal force here.[16]

With respect to Annette Aviation plaintiff has presented several documents specifically referring to Annette Aviation as a corporate asset. Other documents imply that same conclusion. Again without recounting in detail the specific evidence presented it is sufficient to note that here, too, plaintiff has met its burden in response to defendant's motion.[17] It has not, however, established this fact sufficiently to carry its own motion.[18]

15. Plaintiff also contends that there may have been changes in the earlier lease that have not been made available to it but to which these subsequent documents refer. It appears that many Metlakatlan documents are missing at this time and this argument is far from frivolous. However, it is not necessary to consider this argument.

16. *See* pgs. 1132 to 1133, *supra.*

17. The court notes with more than a passing interest the 1975 contract between the "Metlakatla Indian Community, a corporation", and Standard Oil relating to Annette Aviation. If the community was still confused as to the corporate/governmental distinction at this late

date the affidavit of counsel for the corporation indicating that the distinction was clear to counsel since 1965 is of little avail to show that the Community understood the distinction. If, on the other hand, the Community did understand the distinction and the absence of corporate endorsement on the documents indicates governmental activity, the affidavits stating that no corporate activity occurred are highly suspect.

18. A legal issue not raised by these motions but implicit therein is whether it was possible for the Metlakatlans to act in a corporate capacity when they did not specifically intend to do so. This issue would be presented either if the

■ As a final matter related to the corporate activities defendant characterizes plaintiff's argument as attempting to create a corporation by estoppel. It then states that subject matter jurisdiction cannot be conferred by an estoppel. It is true that subject matter jurisdiction cannot be created by an estoppel. 1 *Moore's Federal Practice,* ¶ 0.60[4], pp. 624–25. However, this contention is based upon a mischaracterization of plaintiff's argument. The evidence of corporate activity is precisely that, evidence. It was submitted to prove that the corporation did in fact operate, not to create a corporation by estoppel.

### Waiver of Corporate Sovereign Immunity— "Sue & be sued" Clause

■ Defendant asserts that even assuming that the activity discussed in the preceding sections was corporate activity that the corporation has not consented to be sued and, hence, this claim is precluded by sovereign immunity. It is clear and apparently undisputed that the mere fact of corporate activity or existence does not waive the sovereign immunity enjoyed by the Community. In the words of the Solicitor, as quoted in *Atkinson,* the corporation has "the possibility for waiver of that immunity . . . ." *Id.* at 174–75.

In this case the plaintiff points to the clause in the Corporate Charter granting the power to "sue and be sued." Section 4. This clause, it asserts, is an explicit waiver of sovereign immunity. Defendant advances several arguments in support of a contrary conclusion.

■ Initially the court must consider the proper standard upon which the "sue and be sued" clause must be reviewed. Defendant asserts that the right to sovereign immunity is much like the Eleventh Amendment protection afforded the states and that any waiver must be clear and explicit. *See Edelman v. Jordan,* 415 U.S. 651, 673, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). This position is well taken. *Maryland Cas. Co. v. Citizens Bank of West Hollywood,* 361 F.2d 517, 521 (5th Cir. 1966). However, the court does not find this clause to be ambiguous in any way and concludes that the corporation is amenable to suit.

Sue and be sued clauses have long been considered waivers of sovereign immunity by the United States. *FHA v. Burr,* 309 U.S. 242, 60 S.Ct. 488, 84 L.Ed. 724 (1940). While the Court in *Burr* indicated that the *extent* of the immunity would be liberally construed it found a waiver almost without question from the words themselves prior to applying the liberal standard in considering the extent of that waiver. With regard to Indian tribes sue and be sued clauses have been found or assumed to constitute such a waiver. *Fontenelle v. Omaha Tribe of Nebraska,* 430 F.2d 143, 147 (8th Cir. 1970); *Maryland Casualty Co., supra,* at 521;[19] *Brunette v. Dann,* 417 F.Supp. 1382, 1385 (D.Idaho 1976) (Circuit Judge Anderson); *Namekagon Dev. Co., Inc. v. Bois Forte Res. Hous. Auth.,* 395 F.Supp. 23, 27 (D.Minn.1974), aff'd., 8 Cir., 517 F.2d 508, 510; *Enterprise Electric Co. v. Blackfeet Tribes of Indians,* 353 F.Supp. 991, 992 (D.Mont.1973); *Martinez v. Southern Ute Tribe,* 374 P.2d 691, 694 (Colo.1962).

Defendant asserts, however, that the "sue and be sued" clause in this Charter is not an absolute right but rather is a "power" over which the Community has control. This assertion is not well taken. The term "power" was explicitly used in several cases holding that there was a general waiver, *Maryland Casualty, supra* at 520; *Namekagon, supra* at 26; *Enterprise Electric, supra* at 992 n. 1; *Martinez, supra* at 693; *See also FHA v. Burr, supra.* This construction

Metlakatlans intended to act as a governmental unit but used corporate forms, or if they acted "negligently" or "recklessly" in intermingling corporate and governmental affairs without a full understanding of these separate entities. This issue should perhaps be resolved by appropriate motion prior to trial of this case.

**19.** Apparently in response to the protection afforded the Indians in cases such as *Maryland Casualty* under the restrictions on their sue and be sued clause the Metlakatla Community forwarded a like restriction to the Secretary of the Interior for approval. To date this revision has not been approved.

reflects the normal understanding of the phrase.

It also appears to reflect the Metlakatla Community's prior understanding of the phrase. The complaint filed in *Metlakatla Indian Community v. Egan*, 369 U.S. 45, 82 S.Ct. 552, 7 L.Ed.2d 562 (1962), states that "The plaintiff herein is a federally chartered corporation, organized and existing under the laws of the United States and *is qualified to bring suit and to be sued in courts of competent jurisdiction*." Plaintiff's exhibit 22, p. 1 (Emphasis added).[20] By granting the power to sue and be sued the corporation has attempted to waive generally its sovereign immunity.

Defendant's next contention is that such a waiver for tort actions is beyond the authority granted to the Secretary in 25 U.S.C. § 477. It concludes that the Secretary was only empowered to authorize waivers of immunity necessary to fulfill the purposes of § 17. As that section was intended to allow the Indians to enter the business community to obtain credit it maintains that waivers of sovereign immunity are allowed only on such matters as contract actions. It asserts that other, more general waivers, must be approved by Congress citing *United States v. United States Fidelity & Guaranty Co.*, 309 U.S. 506, 512–13, 60 S.Ct. 653, 84 L.Ed. 894 (1940).

 It is undoubtedly correct, that Congress, not the Secretary of the Interior, has the authority to authorize the waiver of sovereign immunity by Indians. *United States v. United States Fidelity & Guaranty, supra*. However, the court concludes that in passing § 17 Congress permitted a waiver of tort immunity of Indian corporations, subject to approval by the Secretary.[21]

 The purpose of § 17 was to allow Indians to enter into business transactions on an equal footing with other corporations. *Atkinson, supra* at 172–175. It cannot be gainsaid in this day of inundating tort litigation against corporations that one who deals with a corporation expects that corporation to be liable in tort. To hold otherwise might not technically preclude suits on business matters. However, it is unlikely that a prospective customer would feel comfortable entering a business office or using a corporate product if the corporation were immune from tort liability. Only with the potential for imposition of tort liability are Indian corporations truly equal, regardless of the desirability of certain aspects of that status. The Metlakatla Indian Community Corporation could have restricted the extent of its sue and be sued clause to prohibit tort liability. *See Maryland Casualty, supra*. It chose not to do so and the Secretary of the Interior was empowered to approve such a general waiver of sovereign immunity to carry out the intent of § 17. Having chosen not to restrict its immunity the Indian corporation now stands in the place of most business corporations and may be liable in tort for its actions.

*Subject Matter Jurisdiction*

As previously stated the basis for federal jurisdiction in this action is diversity of citizenship. The first issue which the court must consider, therefore, is the citizenship for diversity purposes of the parties. It is undisputed that plaintiff is not an Alaskan citizen. The only controversy in this regard concerns the citizenship of the Indian corporation.

Metlakatla asserts that as a federally chartered corporation it is not a citizen of any State, citing *inter alia, Hancock Financial Corp. v. Federal Savings and Loan Insurance Corp.*, 492 F.2d 1325 (9th Cir. 1974). In that case the Ninth Circuit held that the Federal Savings and Loan Insurance Corporation, a federally chartered corporation,

---

**20.** This, of course, is a portion of the evidence reviewed in determining whether the Community had ever acted in a corporate capacity. *See* pgs. 1132 to 1133, *supra*.

**21.** This issue was presented in a similar context with the same conclusion in *Namekagon Devel. Co., Inc. v. Bois Forte Res. Housing Auth.*, 395 F.Supp. 23, 28–29 (D.Minn.1974), and the issue was not raised on appeal, *see* 517 F.2d 508, 510 n. 1 (8th Cir. 1975).

was not a citizen of Washington, D.C. for diversity purposes. The basic rationale of the opinion was that if the FSLIC were a citizen of Washington, D.C., virtually every suit against it could be based upon diversity jurisdiction. However, as Congress had specifically limited the scope of jurisdiction over federally chartered corporations in 28 U.S.C. § 1349 [22] a finding of diversity jurisdiction would circumvent the intent of the more specific statute.

This rationale is not persuasive in the case at bar. A general exception to holding in *Hancock, supra,* concerns federally chartered financial institutions doing business essentially in one state. In such circumstances the courts have held the bank to be a citizen of that state. *Feuchtwanger Corp. v. Lake Hiawatha Federal Credit Union,* 272 F.2d 453, 455–56 (3d Cir. 1959); *Elwert v. Pacific First Federal Savings and Loan Association of Tacoma,* 138 F.Supp. 395, 401–402 (D.Or.1956); 1 *Moore's Federal Practice,* ¶ 0.77[2.–4]. The distinguishing factor in several cases has been whether the federally chartered corporation generally had a situs within one state or was authorized to do business and doing business in several states. *See Feuchtwanger, supra; Elwert, supra; Harris v. American Legion,* 162 F.Supp. 700, 707–708 (S.D.Ind.1958) aff'd and opinion adopted 7 Cir., 261 F.2d 594; *Rice v. Disabled American Veterans,* 295 F.Supp. 131, 133 (D.D.C.1968).

■ Application of this test furthers the Congressional intent in creating § 17 corporations without posing the problem foreseen by the court in *Hancock, supra.* By treating this Alaska based corporation as an Alaskan citizen for diversity purposes it will be placed in a position comparable to other Alaskan corporations. In one case the court has noted its general concurrence

with this principle, *U. S. v. State Tax Commission of Mississippi,* 505 F.2d 633 (5th Cir. 1974), and another adopted this conclusion. *Enterprise Electric Co. v. Blackfeet Tribe of Indians,* 353 F.Supp. 991, 992 at n. 5 (D.Mont.1973). As defendant's only major business activities, and situs, are located in Alaska it is an Alaskan corporation for diversity purposes.

■ The next issue with respect to subject matter jurisdiction is whether the state courts in Alaska could hear and determine this action. Under the rule of *Erie v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), a federal court sitting in diversity does not have subject matter jurisdiction unless the state courts would also have subject matter jurisdiction. *Hot Oil Service, Inc. v. Hall,* 366 F.2d 295, 297 (9th Cir. 1966). Defendant mounts several arguments in support of its position that the state courts would not have jurisdiction over this action.

The central objection to state court jurisdiction over this action is based on the premise that the sole basis for such jurisdiction is 28 U.S.C. § 1360 which defendant concludes cannot be utilized to confer jurisdiction in this action. While the court agrees with the conclusion reached it does not agree with the underlying premise. 28 U.S.C. § 1360 provides in part that Alaska State Courts have jurisdiction over civil causes of action between Indians or to which Indians are parties which arise in areas of Indian country to the same extent that such courts have jurisdiction over other civil causes of action. It further provides that the civil laws of Alaska which are of general application to private persons or private property shall have the same force and effect within such Indian country as they have elsewhere in Alaska.[23]

**22.** 28 U.S.C. § 1349 provides:

The district courts shall not have jurisdiction of any civil action by or against any corporation upon the ground that it was incorporated by or under an Act of Congress, unless the United States is the owner of more than one-half of its capital stock.

**23.** 28 U.S.C. § 1360 provides:

(a) Each of the States or Territories listed in the following table shall have jurisdiction over civil causes of action between Indians or to which Indians are parties which arise in the areas of Indian country listed opposite the name of the State or Territory to the same extent that such State or Territory has jurisdiction over other civil causes of action, and those civil laws of such State or Territo-

Section (b) of that statute essentially states, *inter alia*, that it does not authorize the encumbrance of real property belonging to any Indian tribe nor shall it authorize regulation of such property in a manner inconsistent with any Federal statute or regulation made pursuant thereto.[24]

■ Defendant first contends that the § 17 corporation is not an "Indian" within the terms of the statute so that it does not apply to confer jurisdiction *ab initio*. The court agrees with this proposition. In considering this statute the Supreme Court stated in *Bryan v. Itasca County*, 426 U.S. 373, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976), that "tnere is notably absent any conferral of state jurisdiction over the tribes themselves . . . ." *Id.* at 389, 96 S.Ct. at 2111. The language of the statute is no more susceptible of an interpretation making it applicable to the § 17 corporation than it was to the tribe and defendant's conclusion that 28 U.S.C. § 1360 does not afford jurisdiction in this case is correct.

■ This conclusion, however, does not end the court's analysis. In considering the question of the power of the state courts to adjudicate matters involving an Indian Tribe the Alaska Supreme Court in *Atkinson v. Haldane*, 569 P.2d 151 (Alaska 1977), analyzed 28 U.S.C. § 1360 in terms of a potential waiver of sovereign immunity rather than jurisdiction as that term is used in cases involving federal jurisdictional issues. *Id.* at 167 & 175. However, as has previously been demonstrated, the § 17 corporation has the ability to waiver sovereign immunity and plaintiffs herein need not rely on 28 U.S.C. § 1360 to find such a waiver. Hence, absent other considerations, the state courts would have the power to adjudicate these claims and this court has diversity jurisdiction.

*Regulation of Indian Trust Lands*

Defendant asserts that a finding of liability in this case would result in an improper interference with Indian trust lands. The court disagrees with this contention. This result is based in part upon the Ninth Circuit's opinion in *Santa Rosa Band of Indians v. Kings County*, 532 F.2d 655 (9th Cir. 1975), and 25 C.F.R. 1.4.

25 C.F.R. 1.4 provides:

(a) Except as provided in paragraph (b) of this section, none of the laws, ordinances, codes, resolutions, rules or other regulation of any State or political subdivision thereof limiting, zoning, or otherwise governing, regulating, or controlling the use or development of any real or personal property, including water rights, shall be applicable to any such property leased from or held or used under agreement with and belonging to any Indian or Indian tribe, band, or community that is in trust by the United States or is subject to a restriction against alienation imposed by the United States; or shall authorize regulation of the use of such property in a manner inconsistent with any Federal treaty, agreement, or statute or with any regulation made pursuant thereto; or shall confer jurisdiction upon the State to adjudicate, in probate proceedings or otherwise, the ownership or right to possession of such property or any interest therein.

(c) Any tribal ordinance or custom heretofore or hereafter adopted by an Indian tribe, band, or community in the exercise of any authority which it may possess shall, if not inconsistent with any applicable civil law of the State, be given full force and effect in the determination of civil causes of action pursuant to this section.

ry that are of general application to private persons or private property shall have the same force and effect within such Indian country as they have elsewhere within the State or Territory:

| State of Territory of | Indian country affected |
|---|---|
| Alaska | All Indian country within the Territory |
| California | All Indian country within the State |
| Minnesota | All Indian country within the State, except the Red Lake Reservation |
| Nebraska | All Indian country within the State |
| Oregon | All Indian country within the State, except the Warm Springs Reservation |
| Wisconsin | All Indian country within the State |

(b) Nothing in this section shall authorize the alienation, encumbrance, or taxation of any real or personal property, including water rights, belonging to any Indian or any Indian tribe, band, or community that is held

**24.** *See* note 23 *supra*.

held in trust by the United States. . .

(b) The Secretary of the Interior or his authorized representative may in specific cases or in specific geographic areas adopt or make applicable to Indian lands all or any part of such laws, ordinances, codes, resolutions, rules or other regulations referred to in paragraph (a) of this section as he shall determine to be in the best interest of the Indian owner. . .[25]

Resolution of the issue presented must begin with a determination of whether application of tort liability in this case is a law limiting, or otherwise governing, regulating or controlling the use or development of real property within the meaning of the regulation. It apparently is undisputed that the land upon which the airport is built belongs to an Indian, Indian tribe, community, or band and that it is held in trust by the United States.

Plaintiff has stated two theories of recovery in tort for the acts of defendant. The first is the duty of an owner or possessor of the airport facility. The second is that Annette Aviation as a business enterprise had a duty to warn of the allegedly dangerous condition of the airport. The court considers these theories in reverse order.

█ Assuming that Annette Aviation is operated by the section 17 corporation the latter basis of liability does not seek damages based primarily upon the corporation's status as landowner. Rather, the main basis for the liability sought to be imposed is that imposed upon a business enterprise based upon allegations of simple negligence. While, in fact, this liability results indirectly from an allegedly improperly maintained airport the liability is not imposed upon the corporation as a landowner. The liability is based in substantial part upon the breach of a duty to warn of a dangerous condition and thus to that extent does not control, regulate, or limit the use of the land such that it would be impermissible under the regulation. As to this portion of the claim for relief the regulation is basically inapplicable.

█ The claim for relief based upon the ownership of the airport and the portion of the prior claim based upon failure to remove the berm presents a different issue. This liability is based solely upon the corporation's alleged ownership or control of land. To impose such liability would have the effect of at least indirectly limiting the use and enjoyment of land. As put by plaintiff "[a]t the most, Annette Aviation might choose to conduct its future business operations with more caution . . . ." Memorandum of March 8, 1978, at p. 20. As to the claim based upon ownership or control this caution would entail certain measures directly related to the use of the land and, hence, such a claim would impinge on the free enjoyment of that land.

█ The court also concludes that application of tort liability would be a rule or law within the meaning of the regulation. The regulation refers to any "laws, [and names] ordinances, codes, resolutions, rules or other regulations . . . ." It is apparent that this wording is extremely broad and that tort liability can be read as a "law" or "rule." Given the the general tenet of Indian law that all ambiguities must be resolved in favor of the Indians, see *Santa Rosa Band of Indians, supra,* at 660, there can be little doubt about such inclusions. This interpretation is consistent with the interpretation of 28 U.S.C. § 1360 which adopts tort law under the ambit of "civil laws." *Bryan v. Itasca County,* 426 U.S. 373, 384 n. 10, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976).

As the court has concluded the state courts generally would have jurisdiction to consider this claim and 25 C.F.R. 1.4 appears to withdraw that jurisdiction as to the claims based upon the ownership and control of the airport the court must examine the validity of that regulation. The analysis of this issue parallels in many respects that adopted in *Santa Rosa Band of Indians v. Kings County,* 532 F.2d 655 (9th Cir. 1975).

---

**25.** This subsection does not apply as no such adoption has occurred.

The court in *Santa Rosa* initially determined the regulation to be a valid interpretation of statutes other than 28 U.S.C. § 1360. *Id.* at 665–66. Similarly, in the present case, the statute creating the Metlakatla Indian Reserve stated that the land was to be held:

> under such rules and regulations, and subject to such restrictions, as may be prescribed from time to time by the Secretary of the Interior.

26 Stat. 1095, 1101 (1891). 25 C.F.R. 1.4 may be read as an appropriate regulation passed pursuant to this statute.

In *Santa Rosa* the court then concluded that 25 C.F.R. 1.4 was independently justified as an administrative interpretation of the word encumbrance in 28 U.S.C. § 1360(b). *Santa Rosa, supra* at 667. This alternative holding, however, is not available to aid the defendant herein as the *Santa Rosa* court narrowly interpreted encumbrance to include only "traditional land use regulations and restrictions directed against the property itself." *Id.* at 667 n. 20. Imposition of tort liability does not come within this construction. It is also inapplicable as jurisdiction or the waiver of sovereign immunity is not based upon that statute.

The final step in the analysis of the *Santa Rosa* court was to determine whether the regulation was in derogation of the grant of jurisdiction made by 28 U.S.C. § 1360. It is at this point which the analysis in this case differs from that in *Santa Rosa*. In *Santa Rosa* the court concluded as a final step that 25 C.F.R. 1.4 was not in derogation of the jurisdiction granted by 28 U.S.C. § 1360 as the regulation could be construed as a valid interpretation of the "encumbrance" limitation contained in the statute. *Id.* at 667–68. It was at this point in *Santa Rosa* where the court narrowly construed the regulation to refer to ordinary land use regulations. While such a narrow reading does not appear necessary, the court need not pass upon that issue in the present case.[26] Here jurisdiction is not predicated upon 28 U.S.C. § 1360 and limitations placed on the regulation when considered with that statute are simply irrelevant.

The final step in the present case is to determine whether the regulation as applied is in derogation of the general civil jurisdiction, or waiver of sovereign immunity, granted state courts over claims against § 17 corporations. The court concludes that it is. As previously noted a finding of liability in this case will have to be predicated in part upon a transfer of the beneficial ownership of this land to the § 17 corporation.[27] This transfer from the § 16 entity which would enjoy the benefit of the Indian trust land theory, to the § 17 corporation must be viewed with the purpose of § 17 in mind. That section is intended to place the entity on an equal footing with other corporations and the court must conclude that it would authorize imposition of liability such as that sought herein. In a different context the court in *Atkinson, supra,* concluded that the property of the § 17 corporation "would be at risk." *Id.* at 175. To the extent 25 C.F.R. 1.4 is in derogation of the statute creating § 17 corporations as in this case it cannot be utilized to preclude an action. *Cf. Santa Rosa Band of Indians, supra.*

*Conclusion*

To summarize, the court concludes that the facts as presented do not allow a determination as a matter of law on the question of whether the acts precipitating the present action were § 16 or § 17 activities. If the § 17 corporation is involved it has waived the protections of sovereign immunity and is amenable to suit. This court has diversity jurisdiction and the present action could be maintained in the state courts.

**26.** 28 U.S.C. § 1360(b), expressly states that it does not "authorize regulation of the use of such property in a manner inconsistent with any Federal . . . statute . . . or with any regulation made pursuant thereto." As the regulation was construed to have an independent basis in *Santa Rosa* and in the present case it appears to be expressly authorized on a broad basis by the terms of 28 U.S.C. § 1360(b), and need not be limited by the term "encumbrance" to avoid being in derogation of that statute.

**27.** *See* pgs. 1134 to 1135, *supra.*

Accordingly IT IS ORDERED:

1. THAT defendant's motion for summary judgment is denied.

2. THAT plaintiff's motion for summary judgment is denied.

3. THAT the portions of this memorandum captioned "Subject Matter and Jurisdiction" and "Regulation of Indian Trust Lands" involve controlling issues of law as to which there is a substantial ground for the difference of opinion and an immediate appeal from those portions of the memorandum may materially advance the ultimate termination of the litigation. Those portions are certified pursuant to 28 U.S.C. § 1292(b). Counsel should heed carefully the differences in appellate practice under this section and appeals from a final judgment.