MICHAEL LEY, Secretary Department of Revenue
You ask a series of questions relating to whether the State of Wisconsin may constitutionally impose its general sales and use taxes, section 77.51 et seq, Stats., on reservation sales to non-tribal members by Indian retailers of certain taxable goods and services, particularly sales of cigarettes and admissions to bingo and other entertainment events. You also pose a number of questions concerning what enforcement procedures the department may employ in the event a delinquent tax liability is assessed against an Indian retailer.
For purposes of this opinion the term "Indian retailer" means an individual Indian, Indian partnership, Indian corporation or Indian tribe which sells any type of tangible personal property or services taxed under section 77.52 (1) or (2), on the Indian reservation where the retailer's business is located. Cf. sectionTAX 9.01 (4) Wis. Adm. Code.
For the reasons explained below, the state may not constitutionally impose the general sales tax, section 77.52, on reservation sales of cigarettes and bingo admissions by Indian retailers to nonmembers of the governing tribe. The state may, however, impose the use tax, section 77.53, on such cigarette sales and, arguably, on sales of bingo admissions. Section 77.53
requires Indian retailers to precollect the use tax. Whether the chapter 77 use tax may be imposed on reservation sales of other types of services to non-Indians would depend on the facts of the particular case. There are, in addition, a variety of impediments to effective enforcement of delinquent tax liability when Indian retailers are involved, particularly if the retailer is the tribe itself or a tribal corporation.
Considering first your questions concerning imposition of the tax, you ask:
 1. Whether the State of Wisconsin may impose the sales tax upon Indian retailers who make sales of tangible personal property under s. 77.52 (1), Stats., such as cigarettes, sold on Indian reservations to persons other than enrolled members of the tribe residing on the tribal reservations? *Page 136 
 2. Whether the State of Wisconsin may require such Indian retailers to precollect the use tax on the sales described in the preceding question?
 3. Whether the State of Wisconsin may impose the sales tax upon Indian retailers who sell taxable services, such as admissions to entertainment events and bingo under s. 77.52 (2)(a)2., Stats., furnished and sold on Indian reservations to persons other than enrolled members of the tribe residing on the tribal reservation?
 4. Whether the State of Wisconsin may require such Indian retailers to precollect the use tax on the sales described in the preceding question?
I discussed application of Wisconsin's former cigarette tax statute, chapter 139, subchapter II, Stats. (1979), to Indian persons or tribes selling cigarettes on Indian reservations in detail in an earlier opinion. 68 Op. Att'y Gen. 151 (1979). Seealso Washington v. Confederated Tribes of the Colville IndianReservation 447 U.S. 134 (1980). The case law governing the state's authority to tax activities of Indians on their reservations discussed in my 1979 opinion, together withColville, clearly control the application of the state's chapter 77 sales and use taxes to reservation Indians.
As noted in my earlier opinion:
 The United States Supreme Court . . . [has] made clear that a general exemption from state taxes extends to Indian tribes and Indian persons within reservation boundaries. As indicated the Court in Moe v. Confederated Salish and Kootenai Tribes Etc., 425 U.S. 463 (1976), specifically struck down Montana's personal property tax on property located within the reservation; the vendor license fee sought to be applied to a reservation Indian conducting a cigarette business on reservation land; and the cigarette sales tax as applied to on-reservation sales by Indians to Indians. It follows that where the burden of the tax sought to be imposed is on an Indian person or Indian tribe located within reservation boundaries, such tax cannot be lawfully imposed. . . .
 Use taxes together with sales taxes constitute a general taxing plan under which everything is taxable at the retail level unless *Page 137 
specifically exempted. See Dept. of Revenue v. Milwaukee Refining Corp., 80 Wis.2d 44, 257 N.W.2d 855 (1977). The tax burden of a use tax is on the consumer.
68 Op. Att'y Gen. at 155-57.
Relying on Moe, the opinion concluded:
 If [an Indian] retailer's sales are to Indian persons on a reservation, such sales are not subject to . . . tax [under ch. 139, such. II, Stats.].
 . . . [Nonetheless], the state does have jurisdiction to require Indian retailers doing business on a reservation to precollect [alternate use] taxes on sales to non-Indians assuming that state law requires such precollection.
Id. at 158-61. See also Colville, 447 U.S. at 151.
The statutory scheme authorizing the chapter 77 sales and use tax is similar in material respects to the manner in which cigarettes were taxed prior to the 1983 amendments to chapter 139, subchapter II, discussed below. As already noted, chapter 77, subchapter III, the Wisconsin sales and use tax law, constitutes a general taxing plan under which everything is taxable at the retail level unless specifically exempted. Dept.of Revenue v. Milwaukee Refining Corp., 80 Wis.2d 44, 49,257 N.W.2d 855 (1977). Under ordinary circumstances the incidence of the general sales tax falls directly on the retailer. Id., sec.77.52 (1), Stats. The answer to your first and third questions, therefore, follows: the state may not constitutionally impose its general sales tax, section 77.52 (1), upon sales of either cigarettes or bingo admissions by Indian retailers on their reservation regardless of the identity of the purchaser of those goods or services. Because the incidence of the tax falls directly on the Indian retailer, the tax is impermissible. Moe,425 U.S. at 480-81; Mescalero Apache Tribe v. Jones, 411 U.S. 145,148 (1973).
Under the statutory sales tax scheme, a "use" or excise tax equivalent to the sales tax is imposed on the "storage, use or other consumption" of goods and services to which the sales tax applies if the sales tax has not been paid. Sec. 77.53, Stats. In the case of a sale by an Indian retailer to a non-Indian purchaser, the incidence of the use tax, section 77.53, falls on the purchaser. Cf., Colville, 447 U.S. at 142 n. 9. Accordingly, in answer to question two above. *Page 138 
the state can require Indian retailers doing business on the reservation to precollect the use tax, section 77.53, on sales of cigarettes to non-Indians, assuming that state law requires such precollection. Moe, 425 U.S. at 481-83; Colville,447 U.S. at 150-51 and n. 25; 68 Op. Att'y Gen. at 161.
In my opinion, section 77.53 clearly requires such precollection. See sec. 77.53 (3), (4), (5) and (7), Stats. Precollection requirements are a common feature of state use tax statutes, because of the impracticality of collecting use taxes directly from individual consumers. National Geographic Societyv. California Board of Equalization, 430 U.S. 551, 555 (1977). A precollection requirement is consistent with the statutory purpose of the use tax law of taxing sales not reached by the general sales tax. Rice Insulation, Inc. v. Department ofRevenue, 115 Wis.2d 513, 515, 340 N.W.2d 556 (Wis.App. 1983).See gen. McCloud, Sales Tax and Use Tax: Historical Developmentsand Differing Features, 22 Duquesne L. Rev. 823 (1984). In the case of an Indian tribe located within the taxing state, the constitutionally required nexus for imposition of the precollection requirements clearly exists, as noted in the district court decision in Colville. Confederated Tribes ofColville v. State of Washington, 446 F. Supp. 1339, 1357-58 (E.D. Wash. 1978), affirmed and reversed in part on other grounds inColville, 447 U.S. 134.
Finally, the conclusion that section 77.53 requires retailers to precollect the use tax is strongly supported by NationalGeographic currently the leading case on the constitutionality of use tax collection statutes. National Geographic involved the constitutionality of the California statute, on which the Wisconsin sales and use tax statute was originally patterned. In fact, a comparison of the California statute quoted in National Geographic, 430 U.S. at 553 n. 1, with current section 77.53 (3) reveals that the language requiring collection of the use tax by retailers is substantially identical. I have no difficulty concluding, therefore, that section 77.53 requires precollection of the use tax by Indian retailers.
Your fourth question asks about application of the use tax to taxable services such as admissions to bingo and entertainment events conducted on the reservation. I have been unable to locate any precedent which resolves the issue of whether taxes on the sale of tangible goods are distinguishable, under Colville, from taxes on the sale of services. My analysis of Moe, Colville and subsequent *Page 139 
Supreme Court cases addressing the question of a state's taxing or regulatory authority over non-Indians on an Indian reservation suggests that the state arguably may apply the use tax to sales of bingo admissions, but that authority to tax other services cannot be resolved without reference to the facts of each case.See gen. White Mountain Apache Tribe v. Bracker, 448 U.S. 136
(1980); Central Machinery Company v. Arizona State TaxCommission, 448 U.S. 160 (1980); Ramah Navajo School Board, Inc.v. Bureau of Revenue of New Mexico, 458 U.S 832, 73 L.Ed.2d 1174
(1982); New Mexico v. Mescalero Apache Tribe, 462 U.S. 324,76 L.Ed.2d 611 (1983) ("Mescalero Apache II").
The cited cases suggest a number of factors that are relevant to the determination of whether a particular state tax on non-Indians on a tribal reservation may infringe on tribal sovereignty or be preempted by federal law. These include:
 1. Is there a pervasive scheme of federal regulation in the area? See White Mountain, Ramah Navajo Central Machinery and Mescalero Apache II.
 2. Would the state tax or regulation adversely affect the tribe's ability to comply with federal policies, including tribal self-sufficiency and self-determination See White Mountain and Mescalero Apache II.
 3. Do the taxes burden commerce that would exist on the reservation regardless of the claimed exemption? See Moe, Colville.
 4. On whom does the burden of the tax ultimately fall? See Moe, Colville White Mountain and Ramah Navajo.
 5. Is the state's tax justified by any regulatory function or service? See Ramah Navajo and Mescalero Apache II, cf: Rice v. Rehner 463 U.S. 713, 724 103 S.Ct. 3291, 3298 (1983).
In the case of taxation of bingo admissions, application of each of the five factors identified above would appear to favor imposition of the chapter 77 use tax on non-Indians. There is no pervasive scheme of federal regulation, nor does it appear that the tribe's ability to comply with federal policies would be adversely affected by imposition of the tax. As discussed, the burden of the tax falls on the non-Indian consumer. Wisconsin has a strong interest in the regulation of bingo, at least with regard to non-Indians. Wis. *Page 140 
Const. art. IV, sec. 24 and chs. 163 and 945, Stats. See alsoOneida Tribe of Indians of Wis. v. State of Wis., 518 F. Supp. 712
(W.D. Wis. 1981). Particularly reminiscent of Colville is the fact that in promoting their high stakes bingo operations, the various tribes are clearly marketing their exemption from Wisconsin's stringent regulation of bingo-related activities.Cf., Id. 447 U.S. at 155, 157.
In answer to your fourth question, therefore, the state arguably has authority to impose the chapter 77 use tax on non-Indians purchasing admission to bingo events on Indian reservations. As already discussed, section 77.53 requires precollection of the tax by Indian retailers. With regard to reservation sales of other types of services, the answer would depend on the application of the five factors listed above to the facts of the particular case.
Assuming that a delinquent tax liability can be assessed against Indian retailers for failure to precollect the chapter 77 use tax, you ask the following questions about enforcement:
 5. In the event of a delinquent tax liability, to what extent may the department pursue collection efforts against Indian retailers, particularly in regard to:
a. Garnishing bank accounts of Indian tribes?
b. Seizing cigarettes?
c. Off-setting refunds of cigarette excise taxes?
 6. If not currently authorized, may any of the foregoing collection procedures be authorized by enabling legislation at the state level without violating the federal constitution or laws?
Indian tribes possess the common law immunity from suit enjoyed by sovereign powers and are exempt from suit absent congressional authorization. United States v. United States Fidelity andGuaranty Co., 309 U.S. 506, 512-13 (1940), quoted in Santa ClaraPueblo v. Martinez, 436 U.S. 49, 58 (1978). Aspects of tribal sovereign immunity create, in varying degrees, difficulties with each of the enforcement mechanisms you suggest if the Indian retailer is an Indian tribe or a tribal corporation. Tribal sovereign immunity does not immunize individual Indians or Indian partnerships from suit. Puyallup Tribe v. Washington Game Dept.,433 U.S. 165, 171-72 (1977). Although the difficulties in securing personal jurisdiction over an individual Indian retailer in state court actions such as garnishment may be significant,cf. Sanapaw v. Smith, 113 Wis.2d 232, *Page 141 335 N.W.2d 425 (Ct.App. 1983), criticized, County of Vilasv. Chapman, 122 Wis.2d 211, 361 N.W.2d 699 (1985), this discussion is limited to enforcement efforts against a tribe itself or against a tribal corporation.
Garnishment is the only one of the enforcement methods you mention which requires an action in state court. Garnishment in Wisconsin is a statutory procedure requiring service of process upon both the garnishee and the defendant (in this case, the tribe or tribal corporation). Sec. 812.04 (3) and 812.07, Stats. Commencement of a garnishment action by proper service of process brings the funds held by the garnishee under the jurisdiction of the court. Elliott v. Regan, 274 Wis. 298, 303, 79 N.W.2d 657
(1956); Winner v. Hoyt, 68 Wis. 278, 289, 32 N.W. 128 (1887).
The requirements for service upon a garnishee defendant are not only statutory, chapter 812, but have a constitutional basis as well. See generally Sniadach v. Family Finance Corp., 395 U.S. 337
(1969); Fuentes v. Shevin, 407 U.S. 67 (1972); North GeorgiaFinishing v. Di-Chem, 419 U.S. 601 (1975).
An action for garnishment of a tribal bank account collides directly with the problem of tribal sovereign immunity. UnitedStates Fidelity Guaranty Co., 309 U S. at 512-13; Puyallup,433 U.S. at 172-3. Where tribal sovereign immunity has not been waived, Indian tribes are immune from garnishment actions as either garnishee or defendant. North Sea Products, Ltd. v.Clipper Seafoods, 92 Wash. 2d 236, 595 P.2d 938 (Wash. 1979);Maryland Casualty Co. v. Citizens National Bank of WestHollywood, 361 F.2d 517, 521-22 (5th Cir. 1966). These cases illustrate the general rule that a proceeding against property in which the sovereign has an interest is a suit against the sovereign for which a waiver of immunity is necessary. SeeMaricopa County v. Valley National Bank, 318 U.S. 357 (1943).
A waiver of sovereign immunity by Congress cannot be implied, but must be unequivocal. Santa Clara Pueblo, 436 U.S. at 58. Indeed, Santa Clara Pueblo strongly suggests that only Congress and not the tribe itself can abrogate tribal sovereign immunity.Id., 436 U.S. at 58-59. Furthermore, general statutes such as the Indian Civil Rights Act, 25 U.S.C. § 1301, et seq, or Pub.L. No. 280 (28 U.S.C. § 1360 (a)), the statute providing for state civil jurisdiction in actions to which Indians are parties. do not waive general tribal *Page 142 
immunity from suit. Id., 436 U.S. at 59; Atkinson v. Haldane,569 P.2d 151, 167 (Alaska 1977).
For tribes organized under the Indian Reorganization Act,25 U.S.C. § 461 et seq., two formal types of tribal organizations are possible: governmental corporations organized under section 16 of the act, 25 U.S.C. § 476, and business corporations organized under section 17 of the act, 25 U.S.C. § 477.Atkinson, 569 P.2d at 170-75; S. Unique v. Gila RiverPima-Maricopa, 674 P.2d 1376, 1379-82 (Ariz.App. 1983).
Courts have uniformly held that section 16 corporations, i.e.
tribal governmental units, enjoy full sovereign immunity. See,e.g. Atkinson, 569 P.2d at 174-75; Boe v. Fort Belknap IndianCommunity, Inc., 455 F. Supp. 462 (D. Mont. 1978); ParkerDrilling Co. v. Metlakatla Indian Community, 451 F. Supp. 1127,1131 (D. Alaska 1978).
Section 17 business corporations, on the other hand, clearly have the ability to waive sovereign immunity, although the mere fact of corporate activity or the mere existence of a corporate charter does not waive tribal immunity for governmental conduct.Parker Drilling, 451 F. Supp. at 1136; Gold v. ConfederatedTribes of the Warm Springs, 478 F. Supp. 190, 196 (D. Ore. 1979), and cases cited therein; but see Martinez v. Southern Ute Tribe,150 Colo. 504, 374 P.2d 691, 694 (1962). However, a "sue and be sued" clause in the corporate charter will constitute a waiver of sovereign immunity. See, e.g., Parker Drilling, 451 F. Supp. at 1136;Kenai Oil and Gas, Inc. v. Dept. of Interior, 522 F. Supp. 521
(D. Utah 1981). The scope of waiver is limited by the precise terms of the corporate charter, however, and a tribal business organization may restrict the extent of the waiver to limit its liability. Parker Drilling, 451 F. Supp. at 1137. A common exclusion from waiver, from "the levy of any judgment, lien or attachment upon [tribal] property other than income or chattels especially pledged," preserves tribal sovereign immunity in garnishment actions. Maryland Casualty, 361 F.2d at 521; cf.Namekagon Development Co v. Bois Forte Reservation HousingAuthority, 517 F.2d 508 (8th Cir. 1975).
In summary, bank accounts of a tribal governmental corporation enjoy sovereign immunity from state court garnishment actions. Bank accounts of a tribal business corporation may also be immune from garnishment, unless a sue and be sued clause in the corporate *Page 143 
charter waives sovereign immunity. Even then, scope of the waiver may preclude the availability of garnishment as a remedy for collection of outstanding tax liability in a garnishment action.
With regard to garnishment actions, the limitations on the state's ability to garnish assets of an Indian tribe or tribal business corporation based on tribal sovereign immunity is a matter of federal law. Because only Congress and to a limited extent the tribe itself can waive tribal immunity from suit. state legislation authorizing garnishment of tribal assets would have no effect.
You inquire next about the department's authority to seize cigarettes, presumably shipments destined for sale on the reservation prior to the actual retail sale. As you are undoubtedly aware, off-reservation seizures of cigarettes destined for delivery to Indian retailers on their reservation have been approved by the courts if authorized by statute and warranted by surrounding circumstances. Colville,447 U.S. at 161-62; Stagner v. Wyoming State Tax Commission, 682 P.2d 326
(Wyo.) appeal dismissed, 105 S.Ct. 237 (1984). Circumstances which justify seizure are suggested in Colville where the Court noted that the tribes involved had consistently refused to fulfill validly imposed collection and remittance obligations and pointedly emphasized that the seizures had in fact taken place off the reservation. Colville, 447 U.S. at 161-62. Stagner
suggests that the lack of alternative enforcement options is also a circumstance which would justify seizure as an enforcement mechanism for collection of an otherwise valid tax. Stagner682 P.2d at 331-32.
After Colville, on-reservation seizures are not likely to be approved by the courts, particularly when an off-reservation seizure is an available option. At best, the legality of on-reservation seizures is technically unsettled. The assertion by the state of authority to make on-reservation seizures would invite litigation which the state is likely to lose, given the implicit suggestion in Colville that such seizures would "unnecessarily intrud[e] on core tribal interests." Id.,447 U.S. at 162.
Unlike under the cigarette tax statute itself, chapter 139, subchapter II, there appears to be no clear statutory authority for the department to seize shipments of cigarettes en route to Indian retailers who have refused to comply with the collection and remittance obligations of section 77.53. Cf sec. 139.40, Stats. Nonetheless, *Page 144 
in view of Colville and Stagner, clearly delineated statutory authority to seize goods when there is a documented pattern of refusal to comply with validly imposed state tax obligations would not violate federal law, as long as the seizures occurred outside a tribal reservation. Of course, as with garnishment, if on-reservation seizures are preempted as a matter of federal law, the acquisition of additional statutory authority under state law would be ineffective.
Finally, you ask about the department's authority to offset refunds to Indian tribes of cigarette taxes under chapter 139, subchapter II, particularly section 139.323, Stats. (1983), against a use tax liability assessed under chapter 77, subchapter III. I am not aware of any basis in federal law to suggest that such a procedure would be illegal as long as the taxes involved are valid and basic constitutional requirements, including the right to due process, are met. Cf. Moe, 425 U.S. at 483;Colville, 447 U.S. at 161-62.
I am, however, of the opinion that such an offset is not currently authorized by statute and that it may be difficult, for a variety of reasons, for the department to secure the additional authority to offset tribal refunds under section 139.323 against an outstanding use tax liability under the general sales tax statute. My opinion, in this regard, is based both on the unambiguous language of section 139.323 itself and on the legislative history of the 1983 amendments to the cigarette tax statute contained in 1983 Wisconsin Act 27.
Following my 1979 opinion, the department interpreted chapter 139, subchapter II, as containing an implied exemption from the state's cigarette tax law for Indian persons or tribes buying or selling cigarettes on their reservations See section TAX 9.08
Wis. Adm. Code (1981). The 1979 opinion also highlighted the fact, however, that under the existing statute, the department had no effective means of collecting the alternative use tax lawfully imposed by section 139.33 on non-Indian purchasers when the sales occurred on Indian reservations or on Indian trust lands. This loophole in the cigarette tax law resulted in significant annual revenue losses from reservation cigarette sales to non-Indians in the years following 1979. (See Veto Message on 1981 S.B. 783. Budget Adjustment Bill, April 29, 1982, P. 4).
In 1982, then Governor Dreyfus vetoed statutory amendments to chapter 139 patterned directly on the Washington statute approved in Colville, largely because of vigorous tribal opposition to *Page 145 
the amendments. In doing so, the Governor urged that legislation be developed which would accommodate both state and tribal interests. Id.
Following the Governor's veto of the 1981 amendments to chapter 139, state and tribal representatives developed a mutually acceptable proposal which was substantially incorporated into Governor Earl's 1983 Budget Bill (See LRB bill folder for 1983 S.B. 83, secs. 1496-1507). The amendments to chapter 139, subchapter 11, were modified in minor respects during consideration by the Joint Finance Committee and were subsequently enacted without further change. See Sen. Sub. Amend. 1 to 1983 S.B. 83, secs. 1502m and 1506m, and 1983 Wisconsin Act 27, secs. 1496-1506m.
The 1983 amendments made two principal changes in chapter 139, subchapter II. First, the tax on cigarettes imposed by section139.31 was changed from an occupational tax on the seller to an excise tax, the incidence of which falls on the ultimate consumer purchaser. Sec. 139.31 (1), Stats. (1983). Secondly, the department was authorized to enter into voluntary agreements with the various state tribes, the net effect of which is to refund to the tribe seventy percent of all taxes collected under section139.31 (1) in respect to cigarette sales on that tribe's reservation or trust lands as well as all such taxes precollected on sales to tribal members. Secs. 139.323 and 139.325, Stats. (1983).
Section 139.323 contains no express authority for the department to offset the seventy percent tribal refund authorized thereunder against tax liability assessed under the sales tax statute. The statute is not ambiguous, but even if it were, the legislative history discussed above would not support an argument that such authority could be implied. Instead, the legislative history of the 1983 amendments to chapter 139 strongly suggests that the conditions set forth in section 139.323 for the seventy percent tribal refund were intended to be mandatory, precise and exclusive.
The enactment of the 1983 amendments to the cigarette tax law and their ongoing administration with regard to sales on Indian reservations has been, as you know, dependent to a significant degree on the cooperation of tribal authorities. This is a factor you undoubtedly will wish to consider in deciding whether to seek statutory *Page 146 
authority to offset section 139.323 refunds against tax liability assessed under the general sales tax law.
BCL:MAM